## EDWARDS *v.* ELLIOTT ET AL.

1. Where the record before the court, on a case from a State court, shows a declaration, pleas to it, issue on them, verdict on those issues and judgment on the verdict, without allusion to any demurrer, the court will not refer to opinions in books of printed reports of the State court to contradict the record and to show that there was a demurrer to the declaration, and that judgment overruling the demurrer was given. [It was stated in this case by counsel that the demurrer after judgment against it had been withdrawn.]

2. Where a record brought regularly to this court, on a writ of error and appeal bond which operate as a supersedeas, shows a judgment quite intelligible and possible, and where a return to a certiorari issued, without prejudice, long after the transcript was filed here and not long before the case was heard, showed that that judgment had been set aside as improvidently entered, and that one with alterations of a very material character had been substituted for it, this court held, "under the circumstances," that the first judgment was the one which it was called on to re-examine.

3. An assignment of error in the highest court of a State to the decision of an inferior State court, that the latter had decided a particular State statute "valid and constitutional," and a judgment entry by the latter court that the statute was not "in any respect repugnant to the Constitution of the United States," is not specific enough to give jurisdiction to the Supreme Court of the United States under section 709 of the Revised Statutes; there being nothing else anywhere in the record to show to which provision of the Constitution of the United States the statute was alleged to be repugnant.

4. However, where the record showed that the case was one of the assertion of a lien under a State statute for building a vessel at a town on what the court might perhaps judicially notice was an estuary of the sea. and where the entry of judgment showed also that the court had adjudged "that the contract for building the vessel in question was not a *maritime* contract, and that the remedy given by the *lien* law of the State did not conflict with the Constitution or laws of the United States," the court held that the latter statement, in view of the whole record, was sufficient to give this court jurisdiction.

5. A maritime lien does not arise on a contract to furnish materials for the purpose of *building* a ship; and in respect to such contracts it is competent for the States to create such liens as their legislatures may deem just and expedient, not amounting to a regulation of commerce, and to enact reasonable rules and regulations prescribing the mode of their enforcement, if not inconsistent with the exclusive jurisdiction of the admiralty courts.

6. The provision of the seventh amendment to the Constitution which se-

cures to every party the right to trial by jury where the amount in controversy exceeds $20, does not apply to trials in State courts.

7. Matters not presented to nor decided by the court below, are not assignable for error here.

ERROR to the Court of Errors and Appeals of the State of New Jersey; the case being thus:

The Constitution ordains that—

"The judicial power [of the United States] shall extend to all cases of admiralty and maritime jurisdiction."

And the Judiciary Act enacts:

"SECTION 9. That the District Courts [of the United States] shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction . . . saving to suitors in all cases the right of a common-law remedy, where the common law is competent to give it."

These provisions of organic and Federal statutory law being in force, an act of the legislature of New Jersey, "for the collection of demands against ships, steamboats, and other vessels,"* approved March 20th, 1857, enacted that whenever a debt shall be contracted by the *master, owner, agent,* or *consignee* of any ship or vessel within the State, on account of any work done or materials furnished in this State for or towards the *building,* repairing, furnishing, or equipping such ship or vessel, such debt shall be and continue a lien on the vessel for nine months; and that any person having such claim over $20 may apply to the proper officer for a warrant to enforce his lien; that the officer receiving the warrant may seize the vessel and give the prescribed notice; that any other person having such lien may make proper demand and proof and be admitted as an attaching creditor; that the owner or any party may at any time before sale apply for her discharge upon giving bond to pay such claims as shall be established to have been subsisting liens under the act; that upon such bond being given the vessel shall be discharged, and the creditors may sue

* Nixon's Digest, 576.

upon the bond alleging their claims and averring them to be subsisting liens; and that if no such bond is given, proceedings may be taken as provided in the act for the sale of the vessel, or such part of her tackle, &c., as shall be sufficient to pay the claims.

This statute of New Jersey being on its statute-book, an article of agreement was made November 3d, 1866, between Henry Jeroleman of the first part, and a certain Hasbrook, and several others of the second, for *building* a schooner of specified dimensions, for the consideration of $54 per ton; the builder to furnish all labor and materials and deliver the vessel. The whole price, at the said rate per ton, was to be about $21,000, and the payments were to be made by Hasbrook and the others, at stated times during the progress of the work, as: $2500 when the keel was laid; $3000 when the frame was up; $2500 when ceiled, and decks laid; $3500 when outside planks were on and squared off; $3500 when the poop deck was on; $2000 when ready for launching, and the balance when delivered according to contract. And it was agreed that *as the said several instalments were paid, the schooner, so far as then constructed, and the materials therein inserted, should be and become the property of Hasbrook and the others.*

The schooner was built at East Newark, New Jersey. Two persons, one named Elliott, and the other Ripley, furnished timber for the vessel; and on the 19th of June, 1867, alleging that they had not been paid for their timber, they caused her to be seized by the sheriff under the already quoted statute of New Jersey; the vessel, at the time of this seizure, being unfinished, on the stocks, and neither named, enrolled, licensed, or provided with a crew or master. Elliott had furnished his timber in November, 1866, and Ripley his, between January 15th and May 10th, 1867.

On the 24th of June, 1867—and, therefore, after Elliott and Ripley had furnished the timber to Jeroleman—Jeroleman assigned the contract giving him the right to build the vessel, to one Edwards, by whom the vessel was finished.

On the 2d of July, 1867, Edwards, the new owner, gave

bond to Elliott and Ripley, in the manner prescribed by the New Jersey statute when a liberation of a vessel from seizure is desired, and the vessel was discharged from the seizure.

Jeroleman had been paid more than the original contract price, but *the time when* any payments had been made to him did not appear; nor any fact upon which an appropriation of payment could be founded.

The vessel being discharged from the seizures, Elliott and Ripley brought suit in the Supreme Court of New Jersey against Edwards on the bond, the declaration alleging that the debt was contracted in *building* the vessel, and that the lien was put upon her while she was yet on the stocks unfinished. The action was debt, and the declaration was in the usual form.

As was stated by counsel in this court, and as is also stated in reports of the case in the Supreme Court of New Jersey,[*] the defendants demurred to the declaration and insisted that the statute of the State, by attempting to create a lien on ships, under State law, assumed a control of a subject in its nature maritime, and one, therefore, over which under the already quoted clauses of the Federal Constitution and of the statutes of the United States, the Federal courts alone had cognizance; and, therefore, that the State statute was void. The New Jersey Reports further state that the demurrer was overruled; the court in its judgment overruling it, admitting that if the lien sought to be enforced, had been for materials used in *repairing* a vessel which had been finished, launched, and enrolled, it could not have been enforced, and that so far as the statute was designed to aid in the enforcement of a maritime contract for which the admiralty might proceed *in rem*—it was void under the objection stated; but holding that the lien set up having been for materials used in *building* a vessel—a matter done on land, entirely under State control, and payment for which might be enforced by a common-law remedy, or by

---

[*] 5 Vroom, 96; 7 Id. 449; 6 Id. 265. The counsel also exhibited a certified copy of the opinion of the court in the cases from the proper repository.

any new remedy which the legislature might provide—the statute was *pro tanto* valid.

The counsel in this court stated that after this opinion the demurrer was withdrawn.

However, *in the transcript of the record sent here nothing whatever about any demurrer appeared.* All that appeared was that to the declaration abovementioned several special pleas were filed, among them these:

" 1. *Nil debet*, generally.
" 2. *Nil debet*, as to Elliott.
" 3. *Nil debet*, as to Ripley.
" 4. Claim of Elliott not a subsisting lien.
" 5. Claim of Ripley not a subsisting lien.
" 6. That Jeroleman, who built the vessel, was not owner or agent.
" 7. That the debts were not contracted by any owner, agent, or consignee."

And that on issues to these pleas the case was tried.

The facts of the case, as already given, were found by a special verdict. .

One question in the case obviously was the question, much agitated in England and here, namely, whether in the case of an executory contract to build a vessel to be paid for by instalments as the work progresses, the title remains in the builder until the work is completed and delivered, or whether the title passes to the person for whom the vessel is to be built; in other words, whether in such a case the contract is one for work and materials or one for sale.

A second question also obviously was (admitting that, as a general principle, the contract is in such a case one leaving the title in the builder until the work is completed and delivered), what was the effect of the final clause of the particular contract under consideration, the part on page 534, italicized, in changing this general rule? If it did change what was assumed to be the general rule, then, *if the payments were made before the materials were furnished,* the title was divested out of Jeroleman, since he, then, though builder, could not be " owner " of the vessel when the materials

were furnished, and, therefore, was not competent to charge it with liens; and consequently the defendants were not liable on their bond, which took the vessel's place.

The Supreme Court was of the opinion that the builder was, on general principles, to be regarded as owner; that the final clause divested his title, on the payments of the money; that the burden lay upon the claimants of the vessel—who were the obligors in the bond—to show the time of these payments, or some fact upon which an appropriation of payment could be founded, and as they had not shown either, that, therefore, in law, the builder (Jeroleman) was to be regarded as the owner when the materials were delivered, and accordingly that debts contracted by him did become liens.

Judgment accordingly went for the plaintiffs, and the case was taken by the defendants from the Supreme Court of New Jersey to what in that State is a still higher court, the Court of Errors and Appeals.

The errors there assigned were:

"1. That the Supreme Court held the act of March 20th, 1857, valid and constitutional.

"2. That the said court decided that Jeroleman, the builder of said vessel, was the owner thereof and competent to charge it with liens.

"3. That the said court adjudged that the respective claims of the plaintiffs were subsisting liens, under the laws of the State of New Jersey, on the vessel, at the time of exhibiting the same."

On the 20th of August, 1872, the Court of Errors and Appeals affirmed the judgment of the Supreme Court. The entry of affirmance, or "rule to affirm," as in the transcript it was called, as the same came here in the transcript, was dated August 20th, 1872, and was thus:

"This case coming on to be heard in the Court of Errors and Appeals, and the said court being of opinion—

"That the act of the legislature of the State of New Jersey, entitled: 'An act for the collection of demands against ships,

steamboats, and other vessels,' approved March 20th, 1857, is not *in any respect repugnant to the Constitution or laws of the United States,* as contended for by the plaintiffs in error, but is in every respect valid and constitutional; and,

"That Henry Jeroleman, the builder of the said vessel, was the owner thereof and competent to charge it with liens; and,

" That the respective claims of the defendants in error were subsisting liens, under the laws of the State of New Jersey, on the said vessel; and

" That the contract for building said vessel is not a maritime contract, and the statutory remedy thereon, to wit, the aforementioned act, does not conflict with the Constitution or laws of the United States; and,

" That the said act does not violate the right of trial by jury, nor conflict *with the constitution of the State of New Jersey in that behalf;* and that there is no error in the proceedings of the Supreme Court herein, and their judgment in the same:

" It is thereupon, on this 20th day of August, A.D. 1872, adjudged by the court here, that the said act of the legislature of the State of New Jersey is not in any respect repugnant to the Constitution or laws of the United States, and that the judgment of the Supreme Court be in all things affirmed."

A writ of error was immediately taken to this court, and within ten days an appeal-bond with good, sufficient security given, that the plaintiff in error should prosecute his writ to effect and answer all damages and costs if he failed to make his plea good. Due service was also made, within ten days, of the writ in the mode prescribed by the Judiciary Act, in order to make the writ a supersedeas. The transcript was filed here, December 6th, 1872.

The case was brought here under the assumption that it came within section seven hundred and nine of the Revised Statutes.*

The record being in this court with the entry of judgment or " rule to affirm," as just given, a suggestion was made here by counsel, May 25th, 1874, that the above-quoted " rule to affirm" had been vacated and set aside by the

---

* See Appendix.

Court of Errors and Appeals, and an amended " rule" substituted therefor since the filing of said transcript, and a certiorari was issued, without prejudice, on the 25th of May, 1874, to bring up any rule entered by the Court of Errors and Appeals in the suit subsequent to the entering of the " rule to affirm," by which the said rule to affirm had been corrected or vacated; and to bring up also any rule which has been substituted for the said rule to affirm.

A return to the certiorari filed in this court August 6th, 1874, showed that it appearing to that court that the " rule to affirm" had been erroneously entered by the attorney of the plaintiffs in error, and did not correctly express the judgment of this court as set forth in the opinion of the court delivered in the cause, it was ordered, on the 1st day of April, 1874, that the said rule to affirm be annulled and stricken from the minutes; and that a rule to affirm the said judgment of the Supreme Court be entered in conformity with the decision of the court on the questions before it.

The following new rule to affirm was accordingly entered *nunc pro tunc* on the record, and sent here as part of the return to the certiorari:

" This cause coming on to be heard, &c., and the court being of opinion that Henry Jeroleman, the builder of the vessel in the declaration of the plaintiffs below mentioned, was the owner of the said vessel at the time when the materials were furnished by said plaintiffs, within the meaning of the act of the legislature of New Jersey, entitled, ' An act for the collection of demands against ships, steamboats, and other vessels,' and as such owners were competent to charge it with liens for such materials; and that the respective claims of the defendants in error were subsisting liens upon said vessel under the said act; and that the said act does not conflict with the constitution of the State of New Jersey by violating the right of trial by jury. It is thereupon, on this 20th day of August, 1872, ordered, adjudged, and determined by the court here, that the judgment of the Supreme Court be affirmed, and that the defendants in error do recover their costs in this court to be taxed."

The case came on for argument, November 24th, 1874.

*Mr. D. McMahon, for the plaintiff in error:*

The first question is, what *case* is before the court? We assert that the *altered* or new entry in the Court of Errors and Appeals forms no part of the case. Our appeal-bond was such that by force of a statute it operated as a supersedeas and a stay of proceedings. The record of the case was up here when the rule was altered, and the counsel of the other side had no right, nor had the court below power to alter the entry of judgment.* By the old practice of the King's Bench it was an offence to do what is said to have been done below.†

We assume then that the *altered* or rather the *substituted* rule, brought up on the return to the certiorari, is to be dismissed from view.

Cleared from that, there is plain matter for review before this court.

The Supreme Court overruled the demurrer raising the exact question of constitutionality under the Constitution and laws of the United States. The very first assignment of errors on the part of the Supreme Court to the Court of Errors and Appeals, was that the Supreme Court held the act of March 20th, 1867, "valid and constitutional."‡ But the judgment of the Supreme Court was affirmed in the Court of Errors and Appeals. Independently of this, however—keeping with the utmost strictness to the transcript, and without adverting to what the authoritative reports of the Supreme Court of New Jersey show,—we still see in the "rule to affirm," of the Court of Errors and Appeals, a Federal question distinctly raised:

1. That court held that the State statute was not in any sense or in any respect repugnant to the Constitution or laws of the United States.

---

* Avendano *v.* Gay, 8 Wallace, 376; Flanders *v.* Tweed, 9 Id. 425; Generes *v.* Bonnemer, 7 Id. 564; Kearney *v.* Case, 12 Id. 275.

† Smith *v.* Cave, 3 Levinz, 312; Clanrickard *v.* Lisle, Hobart, 329; Belt *v.* Collins, 8 Modern, 148; Anonymous, 11 Id. 78; Tazewell *v.* Stone, Burrow, 2454.

‡ See *supra*, p. 537.

This position was certainly reviewable, under section 709 of the Revised Statutes.

2. It also held that the contract for building the vessel in question was not a maritime contract, and, therefore, that the statutory remedy given by New Jersey did not conflict with the Constitution and laws of the United States.

Here is a distinct reference to the provision of the Constitution, and to the ninth section of the Judiciary Act,* confining admiralty jurisdiction to the Federal courts.

Now, we asserted and still assert that the contract for the building of the vessel was a maritime contract. If it was, then the act is clearly, under the case of *The Josephine*,† unconstitutional.

Let us consider, at this place, this point. The first case to be adverted to is *The Jefferson*, decided A.D. 1857.‡ The syllabus of the case, given by the reporter, is thus:

"The admiralty jurisdiction of the courts of the United States does not extend to cases where a lien is claimed by the builders of a vessel for work done and materials found in its construction. *Whether the District Courts can enforce a lien in such cases where the law of the State where the vessel was built gave a lien for its construction, is a question which the court does not now decide.*"

At the time the state of facts arose under which *The Jefferson* was decided, there was no lien law in existence in New Jersey, and the case could have been decided on that point, but the court, or Catron, J., in delivering its opinion, went further, and decided that the contract was not of a maritime character.

However, it is not worth while to comment much on that case, nor on *Roach* v. *Chapman*,§ decided A.D. 1859, where, in its light, the same law is declared by Grier, J., nor yet on *Moorewood* v. *Enequist*,‖ deciding about the same time the same thing. The later and very leading case of *Insurance Company* v. *Dunham*,¶ decided A.D. 1870, has greatly en-

---

* Both quoted, *supra*, p. 534.          † 39 New York, 19.

‡ 20 Howard, 393, 401 ; reported as The People's Ferry Company *v.* Beers.

§ 22 Id. 129.          ‖ 23 Id. 494.          ¶ 11 Wallace, 1.

larged the old ideas as to the extent of admiralty jurisdiction. It really subverts them. In that case, two volumes—long lost—of proceedings in the Colonial courts of admiralty, and but then recently found among the papers of a former registrar of the court and deposited in the library of the Boston Athenæum, were exhibited. They made a revelation, absolutely new to these times, of our ancient exercise of admiralty jurisdiction. They proved that it was bound by none of those slavish and coarcted limits by which a reference to the case of *The Jefferson* will show that Catron, J., in the opinion of the court restricted it. The case which we speak of was elaborately and ably argued. The judgment was unanimous. The case decides:

1. That the admiralty and maritime jurisdiction of the United States is not limited by the statutes or judicial prohibitions of England.

2. That as to contracts, the true criterion, whether they are within the admiralty and maritime jurisdiction, is their *nature and subject-matter*, as whether they are maritime *contracts having reference to maritime service, maritime transactions*, or maritime casualties, without regard to the place where they were made.

And this new and enlarged doctrine must now be taken to be the settled law of this court.

Bradley, J., who delivered the opinion, refers to the views of Grier, J., and observes that the mind of that great judge underwent some change, in the progress of his judicial life, about the extent of admiralty jurisdiction, and that though he dissented, A.D. 1848, in the case of *The Lexington*, when it was decided, he afterwards appeared to receive the decision as setting forth a right view; and that when in a late case, *The Jefferson* (in which he had concurred), was pressed upon him as obliging him to narrow views of admiralty jurisdiction, he intimated that that case was to be confined to the *precise question* then before the court.

Examining the case now before us—the case of a three-masted schooner, to cost $54 a ton, and (as the contract price amounted to about $21,000) of a tonnage over four hundred

tons, built at East Newark, New Jersey, which the court can judicially notice is on the Newark Bay, an estuary or arm of the sea, in which she was to be launched—examining the case we say by the test presented by *Insurance Company* v. *Dunham*, the contract for building this vessel had direct " reference to maritime service and maritime transactions;" and the furnishing of materials toward the construction of such a vessel was as much maritime as the furnishing materials to any vessel undergoing process of rebuilding or thorough repairing. If the materials furnished to this vessel had been furnished to a vessel that had been once launched, it will be admitted that the lien would be a maritime one; though the vessel were one which had been wrecked and required to be nearly rebuilt; nay, even though she were so far gone, that piece by piece, everything in her required to be new. Wherein does our case differ from either of such cases? Nay, wherein does it differ from *any* case where a vessel is hauled out of water and put upon the dry-dock and there repaired under a contract made on shore? In one case just as much as the other, the contract is a contract made on land, and to be performed on land.

If under the rule laid down in *Insurance Company* v. *Dunham*, the sources of admiralty jurisdiction are to be found in the continental countries of Europe, and in the decisions or practices of our admiralty courts under the Colonial rule and after the formation of our government, and are not to be taken exclusively from England, it will be found that contracts relating to the building of a new ship or furnishing materials for that purpose were well-recognized subjects of admiralty jurisdiction; and that our District Courts for many years entertained jurisdiction over such cases. Mr. Benedict, in the last edition of his Admiralty Practice,* issued A.D. 1870, has fully shown this.

He examines and controverts the cases of *The Jefferson* and of *Roach* v. *Chapman*, and proves by many references that the maritime law as laid down by all the great civilians

---

* Section 213, p. 116.

and jurists, embraced contracts for *building*, repairing, supplying, and navigating ships. His argument and his learning exhaust the subject, and we refer to them only; they being much too extensive for us to quote.

3. The Court of Errors also held that the act does not violate the right of trial by jury, nor conflict with the constitution of the State.

The decision that the act does not violate the right of trial by jury is also reviewable in this court. The State law in effect takes away or obstructs the right of trial by jury, and so abridges one of " the privileges or immunities of citizens of the United States." It, in this case, also " deprives him of his property without due process of law," and it denies to a person residing in New Jersey " the equal protection " of the laws of his State. These matters all fall within the fourteenth amendment.*

*Mr. A. Q. Keasbey, contra :*

I. *The court, having by certiorari brought the amended record here, will treat it as if it had been correct in the first instance, and will examine it to ascertain its own jurisdiction.*

The Court of Errors was bound to make the amendment which it did. It is their duty to see that their records are faithfully kept and speak the truth in all matters to which they relate, and on which the court acted. For the records import absolute verity and cannot be controverted elsewhere. Where any accident or negligence of clerk or attorney has caused an error, it is the prerogative and duty of the court to amend it and make it speak the truth.

And such amendments may be made after the case has been taken to the appellate court. And that court will, when justice requires it, delay their judgment in order to enable the party to apply for such amendment in the court below and bring up the amended record by *certiorari* at any time.†

---

\* Section 1; and see the fifth and seventh amendments.

† Powell on Appellate Proceedings, 173 and 174, and cases there cited.

II. *Upon the amended record this court has no jurisdiction.*

The question of the constitutionality of the act was not before the Court of Errors, and was not decided. The point was raised and disposed of by the Supreme Court on the demurrer. The constitutionality of the act was the sole subject of the judgment then rendered. That judgment was not removed to the highest court, but was acquiesced in, for the defendants asked leave to withdraw their demurrer and plead on the merits.

III. *Conceding—for the sake of argument only—that jurisdiction exists, the only point really urged for reversal is that the court below sustained the act on the ground that a contract for* building *a ship is not a maritime contract.*

That decision, if made, was correct. It follows three solemn decisions of this court, which the opposing counsel would set aside because *Insurance Company* v. *Dunham*, made subsequently to them, manifests so wide a departure from the old restrictions upon admiralty jurisdiction that, as the counsel consider, the logical result must be the abandonment of the position that a contract for building a vessel is not a maritime contract.

It is true that there has been a constant tendency of late days—days beginning, however, in the *Genesee Chief*, decided A.D. 1851, and long anterior to the decision in *Insurance Company* v. *Dunham*, decided in 1870, and anterior to *The Jefferson*, decided in 1857—to throw off the fetters imposed upon the admiralty courts by English traditions, and to place the extent of their jurisdiction upon grounds widely differing from the long-established rules of the English courts, and more in accordance with views derived from its essential nature and objects, and with the laws of the most enlightened and oldest commercial nations of the world; and that by a series of decisions, culminating in *Insurance Company* v. *Dunham*, it is now settled that as to *contracts*, the fundamental inquiry is whether a contract is or is not a *maritime* contract, and that that question depends not upon where the contract was made, but upon its *subject-matter.*

It is useless to speculate whether if the wider views held

A.D. 1870, in the case last named, had been entertained by the judges who decided *The Jefferson*, A.D. 1857, the result would have been different. It is enough to say that during all the changes of opinion manifested by the court, the positions then taken upon this particular point have never been modified, and that in the case of *Insurance Company* v. *Dunham*, Bradley, J., alluding to the fact that in other cases it had been sought to press the decision in *The Jefferson* to its logical result in restricting admiralty jurisdiction, does not deny its soundness or authority, but quotes the answer of Grier, J., to the argument, viz., that the decision of the court that a contract to build a ship was not a maritime contract, must be confined in its effect to that precise question and not extended by implication to other cases.

We admit that all contracts, claims, or services, purely maritime, and touching rights and duties appertaining to commerce and navigation are cognizable in the admiralty courts. But we assert also that to be "maritime" in a jurisdictional sense, such contracts, claims, or services must appertain to *commerce and navigation*, and to ships as their instruments, *after they have become ships*, and have reached the only element upon which navigation can exist; to vessels, as such; floating structures ready for navigation; ready at least for a crew, and prepared to be the subject or occasion for contracts of bottomry, affreightment, wages, insurance, demurrage, salvage, towage, &c., or the instrument of collision or other marine torts and injuries; not to incomplete masses of material in the hands of a manufacturer in a carpenter-shop, which may at some future time become a ship and float upon the seas.

If this is the true position of the court it is of no avail to argue that the jurists and lawgivers of other maritime countries have held that a contract to build a ship is a maritime contract. This may be admitted, and the reasons for such a doctrine may be very sound as applied to the circumstances of those countries.

It is natural that in view of the late tendency to enlarge admiralty jurisdiction Mr. Benedict, whose views were not

sustained in the case of *The Jefferson*, should reargue his case in a new edition of his excellent book, and set forth more fully the Continental authorities in favor of his position. But this court may adopt those views so far as the circumstances of this country seem to require. It *has* adopted them from time to time, in modification of former views, as the exigencies of the case have demanded. It can stop where it pleases. It has deliberately chosen to stop at the point where the ship reaches its native element, and not to trace it back to its first germ on the land. And, as already intimated, it was *after* the wide departure from old views indicated by the decision of the case of *The Genesee Chief* and other cases, that this court distinctly held such a contract not to be maritime. And as that departure grew still wider the court adhered to that view, manifesting no disposition to modify, but only to let it stand as a starting-point.

It is to be noted, moreover, that in every case in which the wider views of admiralty jurisdiction have been announced, the subject-matter has been distinctly maritime in its nature; it has touched rights and duties pertaining to navigation, to commerce conducted on the water, to the character of navigable waters, to contracts of affreightment, and marine insurance, and to torts committed upon public waters. The intention has been plain to hold as to the courts of admiralty, that their " control stops with the shore."

Even if this court would not be restrained from overthrowing its repeated decisions merely for the sake of being logically consistent, it would find reason enough to stand by them in the nature of the question, and in the consequences to which a different view would lead. For if every contract relating to the building of a ship, steamboat, ferry-boat, canal-boat, or other structure intended to float upon the water is a maritime contract, then the jurisdiction of the admiralty courts will indeed be widely extended. It will embrace the preparation of materials in the saw-mill and the foundry intended for maritime uses; the manufacture of marine engines and machinery, the making of cordage and sailcloth, the furniture for cabins and state-rooms, the man-

ufacture of chronometers and nautical instruments, and all the various branches of business which are concerned with the production of materials which may, by simple adaptations, become suited to marine uses. And the character of these contracts would be fixed, and their consequences would attach as soon as the contracts were completed, whether the structure ever really assumed the form of a ship or not.

Endless confusion, indeed, would arise from any attempt on the part of the courts of admiralty thus to follow up a ship to its remotest origin in the forest and the mine. And for this reason it is, that this court, in its widest extension of admiralty jurisdiction, has limited it to ships afloat, after they have in fact acquired the character and been prepared for the uses of marine structures.

The claims here do not arise out of any contract to build a ship, but are simple demands for the price of lumber sold out of lumber-yards to shipbuilders who used them in a structure which probably did become a ship in the course of time, though it does not appear that she is launched yet.

IV. To the point that this State law is repugnant to the Constitution of the United States because it abridges the right of trial by jury, and provides for taking the vessel without due process of law, and because it is contrary, in some way not clearly pointed out, to the fourteenth amendment—it is enough to say that no such question was ever broached in any stage of this suit in the State court.

No similar question even was touched until the case reached the Court of Errors, and there the point was made that the act was in conflict with the constitution of *New Jersey*, by abridging the right of trial by jury.

This point was fully considered by the court and nothing need be added to its opinion, holding the act not to be repugnant to the constitution of the State.

The notion that it violates the Constitution of the United States and the fourteenth amendment is an afterthought and needs no reply. If any were needed, it would be sufficient to say that the constitutional provisions referred to did not profess to control the power of the State governments over

the rights of its own citizens, but only to declare that as the States grant them to their own citizens, or as they limit, or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within their jurisdiction.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Nothing appears in the record to warrant the conclusion that any question re-examinable here was presented in the court of original jurisdiction, whether the proposition is tested by the declaration, the pleas filed by the defendant, the special verdict, or by the judgment, as all alike tend to show that the questions presented, examined, and decided were questions of local law. · Every suggestion of that kind, therefore, may be dismissed without further remark, as they are utterly destitute of support.

Opposed to that statement is the suggestion in argument, that the presiding justice overruled the demurrer to the declaration, but it is a sufficient answer to that suggestion to say that this court cannot go out of the record to re-examine any question under a writ of error to a State court.

Suppose that is so, still it is contended that the defect is supplied by what occurred in the Court of Errors and Appeals.   Tested *alone* by the errors assigned in that court, it is quite clear that the jurisdiction of this court could not be sustained, as the errors. assigned in that court do not show, with sufficient definiteness, that any question cognizable here under a writ of error to a State court was presented to the State Court of Errors for decision.   Complaint, it is true, is made that the subordinate court improperly decided that the lien law of the State is valid and constitutional, but it is not alleged that the law is repugnant to any particular provision of the Constitution of the United States, nor that the court of original jurisdiction rendered any decision upon that subject.†

---

\* The Slaughter-House Cases, 16 Wallace, 77.

· † Messenger *v.* Mason, 10 Id 509; Bridge Proprietors *v.* Hoboken Co., 1 Id. 16; Furman *v.* Nicholl, 8 Id. 44; Maxwell *v.* Newbold, 18 Howard, 516.

Something more must be set forth in such a pleading, to raise a Federal question, than the mere allegation that the law is invalid and unconstitutional, as such an assignment is satisfied if held to refer to the constitution of the State, in which event the question raised is not one cognizable here under a writ of error to a State court.*

If the case stopped there it would be clear that the writ of error must be dismissed for the want of jurisdiction, but it does not stop there, as plainly appears by the judgment of affirmance rendered in the Court of Errors, which shows that the State court of last resort determined, among other things, the following propositions: (1.) That the lien law of the State is not in any respect repugnant to the Constitution of the United States, as contended by the original defendants. (2.) That the contract for building the vessel in question is not a maritime contract, and that the remedy given by the lien law of the State does not conflict with the Constitution or laws of the United States. (3.) That the said lien law does not violate the right of trial by jury nor conflict with the constitution of the State.

Like every other pleading, an assignment of error is subject to a reasonable construction. Reasonably constructed it cannot be held that the first proposition of the judgment of affirmance involves a comparison of the State lien law with every separate provision of the Federal Constitution, and if not with every one, it is impossible to determine with which one, as there is nothing in the judgment or any other part of the record pointing to any particular part of the Constitution, except what is contained in the second proposition of the judgment, which, in view of the whole record, must be regarded as a more complete specification of what is meant by the first proposition.

Viewed in the light of these suggestions it must be understood from the two propositions that the State Court of Errors decided that the contract in this case for the building

---

* Farney *v.* Towle, 1 Black, 351; Hoyt *v.* Shelden, Ib. 521; Railroad Co *v.* Rock, 4 Wallace, 180.

of the schooner was not a maritime contract, and that the law of the State giving the remedy which was pursued by the plaintiffs does not conflict with the Federal Constitution or with Federal laws.    Such an allegation in the judgment of the State court is sufficient to give this court jurisdiction under the writ of error to re-examine that question.    Well-founded doubt upon that subject cannot be entertained, unless it be assumed, as contended by the plaintiffs, that the copy of the judgment embodied in the transcript is not correct.

Due entry of the writ of error to the State court was made here the sixth of December, 1872, and on the first of April, 1874, the Court of Errors decided that the judgment of affirmance, entered there in the case under date of the twentieth of August, 1872, did not correctly express the judgment of the court; and after hearing argument the court ordered that it be wholly annulled, and that it be stricken from the minutes, and that the judgment exhibited in the supplemental record be entered *nunc pro tunc* in lieu thereof.

Alterations of a very material character are made in the substituted judgment, as compared with the judgment originally entered, and which remained unchallenged at the time the writ of error was sued out and when the supersedeas bond was filed.    Such alterations, it is insisted by the defendants, could not properly be made at that stage of the litigation, as the writ of error from this court to the Court of Errors brought up the judgment first mentioned as a part of the transcript annexed to the return made, to the writ of error, by the Court of Errors, to which it was addressed.

Exceptions may arise to that proposition, as broadly stated, but it is not necessary in this case to examine the question in so general an aspect, as whatever may be the power of the Court of Errors to change or amend such a judgment for the purposes of any proceeding under it in the exercise of their own appellate functions, we are, nevertheless, of the opinion that the judgment brought here as part of the return

to the writ of error from this court must, under the circumstances, remain as the judgment which this court is called upon to re-examine and review.*

Enough has already been remarked to show that the judgment of affirmance first rendered raises the question whether the contract under which the vessel was built is a maritime contract, and whether the law of the State which gives the remedy pursued by the plaintiffs is in conflict with the Federal Constitution. Beyond all doubt that question was presented to the State Court of Errors, and was decided by that court adversely to the defence set up by the defendants in the court of appellate jurisdiction.†

Materials were furnished by the plaintiffs to the persons who contracted to build the schooner, during the progress of the work. Payment for the materials being refused, they instituted the described proceedings to enforce the lien given them by the State law, in such a case, against the vessel for which the materials had been contracted.

When the proceedings were commenced the schooner was only partially constructed and was resting on her original stocks, having never been launched into the water. She was without a name and had never been registered or enrolled, nor had she ever been licensed or surveyed, and she was without a master or crew, and the record shows she had never had a commander.

Concede all that and still the defendants contend that the plaintiffs, as the furnishers of the materials, had a maritime lien for their respective claims which may be enforced in the admiralty, and that the State law giving the remedy which the plaintiffs pursued is in conflict with that clause of the Federal Constitution which provides that the judicial

---

.* Generes *v.* Bonnemer, 7 Wallace, 564; Avendano *v.* Gay, 8 Id 376; Flanders *v.* Tweed, 9 Id. 431; Hozey *v.* Buchanan, 16 Peters, 215; Albers *v* Whitney, 1 Story, 310; Brush *v.* Robbins, 3 McLean, 486; Medford *v.* Dorsey, 2 Washington's Circuit Court, 433; Kanouse *v.* Martin, 15 Howard, 210; Cheang-Kee *v.* United States, 3 Wallace, 326; Noonan *v.* Bradley, 12 Id. 129.

† Elliott et al. *v.* Edwards et al , 6 Vroom, 266; Edwards *v.* Elliott, 5 Id 96.

power of the United States shall extend to all cases of admiralty and maritime jurisdiction. They admit, in effect, that to maintain that proposition it is necessary to show that a contract to furnish materials for the construction of a ship is a maritime contract, and they accordingly submit the affirmative of that proposition and insist that all such contracts are maritime, if it appears that the vessel to be constructed is designed for use upon navigable waters.

Maritime contracts are such as relate to commerce and navigation, and unless a contract to build a ship is to be regarded as a maritime contract, it will hardly be contended that a contract to furnish the materials to be used in accomplishing that object can fall within that category, as the latter is more strictly a contract made on land, and to be performed on land, than the former, and is certainly one stage further removed from any immediate and direct relation to commerce and navigation.

Building materials for such a purpose come very largely from the forest and mines, but if it be admitted that a contract to build a ship is a maritime contract it is difficult to affirm that a contract to furnish the materials for the same is not of the same character, although its breach and even its performance may involve judicial inquiries into the business transactions of men, as well in the forests and mines as in the manufactories and workshops of the whole civilized world. Wherever the question, therefore, involved in the present assignment of error, has been considered, the decision has uniformly turned upon the solution of the inquiry whether a contract for building a ship is or is not a maritime contract. Unless the contract to build a ship is a maritime contract, no one, it is presumed, would contend that the furnishers of the materials for such a purpose can successfully support such a claim; and if it be admitted that the builders of a ship may enforce the payment of the contract price in the admiralty, it would be difficult to maintain that the furnishers of the materials for the purpose are not entitled to pursue their remedy to enforce payment in the same jurisdiction.

Shipbuilding is an occupation requiring experience and skill, and, as ordinarily conducted, is an employment on land, as much as any other mechanical employment, and men engage in the business for a livelihood just as they do in other mechanical pursuits and for the same purpose. Shipwrights, unlike the seamen, have their homes on the land, and not on the seas, and they are seldom shipowners, and not more frequently interested in commerce and navigation than other mechanics. Ships are bought and sold in the market just as ship timber, engines, anchors, or chronometers are bought and sold, even before they are fully constructed and before they are equipped for navigation, and no reason is perceived why a contract to build a ship, any more than a contract for the materials of which a ship is composed, or for the instruments or appurtenances to manage or propel the ship, should be regarded as maritime.

Attempt is made in vain to point out any distinction in principle between a contract to build a ship and a contract for the materials, as the latter are included in the former, and both fall within the same category under the rules of the civil law. Every one who had built, repaired, or fitted out a ship, whether at home or abroad, or lent money to be employed in those services, had by the civil law a privilege or right of payment, in preference to other creditors, upon the ship itself, without any instrument of hypothecation, or any express contract or agreement subjecting the ship to any such claim, and that privilege still exists in all those countries which have adopted the civil law as the basis of their jurisprudence.

Authorities to support that proposition are unnecessary, as the proposition is conceded by both parties in this controversy, but that rule was never adopted in England, and the reverse of it is the settled rule in our jurisprudence in respect to the question under consideration. Conclusive support to that proposition is found in the case of *The Jefferson,*[*] in which the opinion of the court is given by Mr. Jus-

---

* 20 Howard, 393.

tice Catron.   By the statement of the case it appears that it
was a libel filed by the assignees of the builders against a
new steam ferryboat for a balance due to the builders on
account of work done and materials furnished in construct-
ing the hull of the ferry-boat.   They claimed a lien for the
unpaid balance of the price, and the decree was in their
favor in the Circuit Court, but the claimants appealed to
this court.   When the cause came up for argument the
first point made for the claimants was that a contract to
build a ship is not one within the jurisdiction of the admi-
ralty courts, even though it be intended to employ the vessel
in ocean navigation.   Sufficient appears in the report of the
case to show that the libellants took direct issue upon that
proposition, and the court say, in disposing of it, that the
only matter in controversy is whether the District Courts
have jurisdiction in admiralty to enforce liens for labor and
materials furnished in constructing vessels to be employed
in the navigation of waters to which the admiralty jurisdic-
tion extends.

Neither shipbuilders nor furnishers of materials for ship-
building had any lien at that date under the State law, but
the court unanimously decided that the admiralty jurisdic-
tion was limited to contracts, claims, and services which
were purely maritime, and to such as had respect to rights
and duties appertaining to commerce and navigation.   Ap-
plying that rule to the case then under consideration the
court say : " So far from the contract being purely maritime
and touching rights and duties appertaining to navigation,
it is a contract made on land to be performed on land."

Convinced or not, every candid inquirer must admit that
this court did decide in that case that neither a contract to
build a ship or to furnish materials for the purpose is a mari-
time contract.   Nor does that decision stand alone, as the
same question since that time has more than once come be-
fore the court and been decided in the same way.   Such was
the view of the court in the case of *Roach* v. *Chapman*,* in

---

* 22 Howard, 129.

which the opinion of the court was given by Mr. Justice Grier.

Proceedings in that case had been instituted in the District Court against a steamer to enforce a lien for a part of the price of the engine and boiler, which had been furnished to the builders in another State, where the steamer was built. Process was served and the claimants appeared and filed a plea to the jurisdiction of the court, which was sustained by the Circuit Court, and the libellants appealed to this court. Able counsel appeared for appellants, but this court decided that a contract for building a ship or for supplying engines, timber, or other materials for her construction is clearly not a maritime contract, and the court remarked that any former *dicta* or decisions which seem to favor a contrary doctrine were overruled.*

During the same session of the court the same question was again presented, and was again decided in the same way.†

Express reference is there made to the case of *The Jefferson,* and the remark of the court is that the court there decided that a contract to build a ship is not a maritime contract; that in this country such contracts are purely local and are governed by State laws, and should be enforced by the State tribunals. Decisions to the same effect have been made in the Circuit Courts, of which the following are examples: *Cunningham v. Hall,*‡ *The Orpheus.*§

State legislatures have no authority to create a maritime lien, nor can they confer any jurisdiction upon a State court to enforce such a lien by a suit or proceeding *in rem,* as practiced in the admiralty courts.||

Other support to that proposition than the act of Congress is not needed, as the provision is to the effect that the District Courts shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, except

---

* The Jefferson, 20 Howard, 400.　　† Morewood *v.* Enequist, 23 Id. 494.
‡ 1 Clifford, 45.　　　　　　　　§ 2 Id. 35.
|| The Belfast, 7 Wallace, 644; The Moses Taylor, 4 Id. 411; Hine *v.* Trevor, Ib. 555.

where the common law is competent to give to suitors a common-law remedy. Common-law remedies are not applicable to enforce a maritime lien by a proceeding *in rem*, and consequently the original jurisdiction to enforce such a lien by that mode of proceeding is exclusive in the District Courts.*

Taken together and properly construed those provisions warrant the conclusion that such a party wishing to enforce such a lien may proceed *in rem* in the admiralty, or he may bring a suit *in personam* in the same jurisdiction, or he may elect not to go into admiralty at all and may resort to his common-law remedy in the State courts, or in the Circuit Court of the United States, if he can make proper parties to give that court jurisdiction of the case. But a maritime lien does not arise in a contract to build a ship or in a contract to furnish materials for that purpose; and in respect to such contracts it is competent for the States, under the decisions of this court, to create such liens as their legislatures may deem just and expedient, not amounting to a regulation of commerce, and to enact reasonable rules and regulations prescribing the mode of their enforcement, if not inconsistent with the exclusive jurisdiction of the admiralty courts.†

Objection is also taken to the validity of the State law upon the ground that it is in conflict with the provision of the Federal Constitution which secures to every party, where the value in controversy exceeds twenty dollars, the right of trial by jury.

Two answers may be made to that objection, either of which is decisive: (1.) That it does not apply to trials in the State courts.‡  (2.) That no such error was assigned in

---

\* Brookman v. Hamill, 43 New York, 554; The Josephine, 39 Id. 19.

† The Belfast, 7 Wallace, 645; Sheppard v. Steele, 43 New York, 55; Ferran v. Hosford, 54 Barbour, 208.

‡ Barron v. Baltimore, 7 Peters, 247; Twitchell v. Commonwealth, 7 Wallace, 326; Livingston v. Moore, 7 Peters, 551; Fox v. Ohio, 5 Howard, 434; Smith v. Maryland, 18 Id. 76; Cooley on Constitutional Limitations, 2d ed. 19.

the Court of Errors, and that the question was not presented to, nor was it decided by, the Court of Errors.

Jurisdiction is not shown unless it appears that some one of the specified questions did arise in the State court and that the question was decided adversely to the party assign. ing error in this court.*

JUDGMENT AFFIRMED, WITH COSTS.

* Crcwell v. Randell, 10 Peters, 392; Suydam v. Williamson, 20 How ard, 440.