**J. J. O'LEARY, Deputy Commissioner, Bureau of Employees' Compensation, Fourteenth Compensation District, United States Department of Labor, Appellant,**

v.

**PUGET SOUND BRIDGE & DRY DOCK COMPANY, Appellee.**

No. 19273.

United States Court of Appeals Ninth Circuit.

July 29, 1965.

John W. Douglas, Asst. Atty. Gen., Morton Hollander, Leavenworth Colby, Attys., Dept. of Justice, Washington, D. C., for appellant.

Edward S. Franklin, John P. Sullivan, Bogle, Bogle & Gates, Seattle, Wash., for appellee.

John J. O'Connell, Atty. Gen. of Washington, John C. Martin, Asst. Atty. Gen., Seattle, Wash., for amicus curiae, State of Washington.

Before HAMLEY and JERTBERG, Circuit Judges, and MATHES, Senior District Judge.

MATHES, Senior District Judge:

Appellee sued in the District Court pursuant to the provisions of § 21(b) of the Longshoremen's and Harbor Workers' Compensation Act [ch. 509, § 21(b), 44 Stat. 1436 (1927); 33 U.S.C. § 921 (b)], to review and set aside, as not in accordance with law, an award of $482.00 disability compensation made to one Bradley under the Act [33 U.S.C. § 908]. Judge Beeks granted appellee's motion for summary judgment, vacating and enjoining enforcement of the challenged compensation award, upon the ground that Bradley's injury was not within the coverage of the Federal Act, but was compensable, if at all, under the provisions of the Washington State Compensation Act. [See Puget Sound Bridge & Dry Dock Co. v. O'Leary, 224 F.Supp. 557 (W.D.Wash.1963).] This appeal is from that summary judgment.

The controlling facts, as found by the Deputy Commissioner, are not in controversy and are summarized in the District Court's opinion as follows:

"Bradley, a machinist employee of plaintiff, was severely injured while installing a rudder post bearing on the stern of the USNS 'COCHRANE', which was lying on plaintiff's building way, Plant No. 1, Seattle, Washington, when he was struck by a piece of timber and knocked from the scaffolding on which he was working to the building way below.

"The building way on which the accident occurred is a permanent shipyard structure located entirely on land which was designed and is used exclusively for new ship construction. To facilitate the launching of completed vessels, the outermost or seaward end of the building way extends into the water on an incline. The tide ebbs and flows around this outermost portion.

"At the time of the claimant's accident, the 'COCHRANE' was unlaunched. Indeed, it did not become waterborne nor had it undergone 'baptismal rites' until some two months following the accident." [224 F.Supp. at 558.]

Section 3(a) of the Longshoremen's and Harbor Workers' Act provides coverage under the Federal statute "only if the disability * * * results from an injury occurring upon the navigable waters of the United States (including any dry dock) * * *." [33 U.S.C. § 903 (a).]

The parties agree that the case at bar presents a single question: whether Bradley's injury is within the coverage of the Act. Also agreed is that the answer to this question turns upon whether the injury occurred upon "any dry dock" within § 3(a) of the Federal statute. [See 33 U.S.C. § 903(a).]

In the record before us there appears a publication of the Department of the Navy, Bureau of Yards and Docks, which classifies and defines dry docks as follows:

"1A–.03 Terms and Definitions. The terms applying to all of the major types of docking facilities are defined in the following paragraphs.

"1. DRYDOCKING FACILITIES. Dry docking facilities are structures that permit the underwater portion of ships or other floating crafts to be exposed for work thereon. The three principal types of drydocking facilities are floating drydocks, graving drydocks, and marine railways.

"2. FLOATING DRYDOCKS. A floating drydock is a floating structure that can be partially submerged to a predetermined depth by flooding the ballast tanks. After the ship to be docked has been floated into position in the dock, the dock and ship are raised by pumping the water out of the ballast tanks until the pontoon deck is clear of water.

"3. GRAVING DOCKS. A graving drydock is a permanently fixed basin with entrance closures constructed at or near the water's edge into which a ship can be floated and which can be pumped dry of water, thereby exposing the underwater portion of the ship's hull.

"4. MARINE RAILWAYS. A marine railway is a permanently fixed track system extending from a point on shore well above the waterline to a point offshore well below the waterline; it is equipped with a cradle capable of moving along the track by means of rollers or wheels, and a cable or chain and hauling mechanism for hauling the cradle carrying the docked ship into or out of the water. A vertical lift is a variation of a marine railway that is used for small craft; it consists of a cradle and lifting device for raising the craft vertically out of the water."

The problem is not, however, purely one of definition. It was, for instance, conceded at the bar upon oral argument that, during the more than thirty years since the phrase "(and including any dry dock)" was adopted as part of the Longshoremen's and Harbor Workers' Compensation Act [see §§ 2(4), 3(a), 44 Stat. 1424 (1927), 33 U.S.C. §§ 902(4), 903(a)], the Government has never before urged that "any dry dock" includes a building way provided and being used exclusively for new-ship construction.

Without reviewing maritime history, we may safely assume that building ways, upon which to construct ships and from which to launch them, necessarily antedated any form of dry dock in or

upon which to repair the ships once constructed. There is nothing in the legislative history of this Act to indicate that the Congress intended to include a building way on which a new ship was under construction within the meaning of the phrase "any dry dock". [See: Calbeck v. The Traveler's Ins. Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962); Avondale Marine Ways, Inc. v. Henderson, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77 (1953); North Pacific S. S. Co. v. Hall Bros., etc., Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919).]

Indeed, since new-ship building has always been considered a non-maritime activity [The Winnebago, 205 U.S. 354, 363, 27 S.Ct. 509, 51 L.Ed. 836 (1907); Edwards v. Elliott, 88 U.S. (21 Wall.) 532, 22 L.Ed. 487 (1874); People's Ferry Co. v. Beers, 61 U.S. (20 How.) 393, 401–402, 15 L.Ed. 961 (1857)], considerations of reason and policy would seem to point to the opposite conclusion respecting the intent of the Congress. As the Court observed in Thames Towboat Co. v. The "Francis McDonald", 254 U.S. 242, 41 S.Ct. 65, 65 L.Ed. 245 (1920):

"* * * the doctrine is now firmly established that contracts to construct entirely new ships are non-maritime * * * in no proper sense can they be regarded as directly and immediately connected with navigation or commerce by water." [254 U.S. at 244, 41 S.Ct. at 66.]

The reason for the exclusion of new-ship construction from the category of maritime activities is well explained in Tucker v. Alexandroff, 183 U.S. 424, 22 S.Ct. 195, 201, 46 L.Ed. 264 (1902):

"Prior to her launching she is a mere congeries of wood and iron— an ordinary piece of personal property—as distinctly a land structure as a house * * *. In the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction." [183 U.S. at 438, 22 S.Ct. 195.]

On the other hand, ship repair has long been considered a maritime activity. [North Pacific S. S. Co. v. Hall Bros., etc., Co., supra, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510; The Robert W. Parsons, 191 U.S. 17, 33–34, 24 S.Ct. 8, 48 L.Ed. 73 (1903); The Planter, 32 U.S. (7 Pet.) 324, 340, 8 L.Ed. 700 (1833).] As explained in North Pacific S. S. Co. v. Hall Bros., etc., Co., supra:

"* * * there is no difference in character as to repairs made upon the hull of a vessel dependent upon whether they are made while she is afloat, while in dry dock, or while hauled up by ways upon land. The nature of the service is identical in the several cases, and the admiralty jurisdiction extends to all." [249 U.S. at 128, 39 S.Ct. at 224.]

Traditionally, the character of a tort as being nonmaritime or maritime, and therefore giving rise to recovery under the Act, has always depended upon either the place of injury [Atlantic Transport Co. of W. Va. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914); The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1865); see: Calbeck v. The Traveler's Ins. Co., supra, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368; Parker v. Motor Boat Sales, Inc., 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184 (1941)], or the nature of the work being performed [Robins Dry Dock Co. v. Dahl, 266 U.S. 449, 45 S.Ct. 157, 69 L.Ed. 372 (1925); North Pacific S. S. Co. v. Hall Bros., etc., Co., supra, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510; Waring v. Clarke, 46 U.S. (5 How.) 441, 457–463 (1847); see Avondale Marine Ways, Inc. v. Henderson, supra, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77]. So an injury sustained in the performance of a nonmaritime contract upon navigable waters is covered by the Longshoremen's and Harbor Workers' Compensation Act [Calbeck v. The Traveler's Ins. Co., supra, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368] while an injury sustained in the performance of a maritime contract upon dry land is also covered by the Act [Avondale Marine Ways, Inc.

v. Henderson, supra, 346 U.S. 366, 74 S.Ct. 100, 98 L.Ed. 77]. In the case last cited, a so-called "Marine railway" on dry land was held to be a "dry dock" within the coverage of the Act, at least while being used in the performance of maritime work—ship repair. [See Avondale Marine Ways, Inc. v. Henderson, 201 F.2d 437, 438 (5th Cir. 1953).]

We are of the opinion, therefore, that not alone the nature and location of the facility, but also the nature and location of the work being done, are to be considered in determining whether a given injury occurred on "any dry dock" within the meaning of the Act.

It would follow then, by parity of reasoning with the Avondale case, that the building way involved at bar would be a "dry dock" while used, as conceivably it might be, for old-ship repair instead of new-ship construction, although one may suppose that such use would *ex necessitate* require conversion of the building way into what would amount to a "marine railway".

The short answer to the "could-be-used" and the "might-have-been-used" arguments is that such is simply not the case at bar.

This case involves an injury sustained upon dry land, while employed in the performance of a non-maritime contract, upon a ship-building way being used for new-ship construction. [Cf. Port Houston Iron Works v. Calbeck, 227 F.Supp. 966 (S.D.Tex.1964).] To construe a building way, so located and so used, to be a "dry dock" would, we think, as applied to the case at bar, confront constitutional questions involving the breadth and scope of "admiralty and maritime jurisdiction" [U.S.Const. Art. III, § 2, Cl. 1]; questions to be avoided when they need not be reached [O'Donnell v. Great Lakes Dredge and Dock Co., 318 U.S. 36, 41, 63 S.Ct. 488, 87 L.Ed. 596 (1943); Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932)].

The statutory presumption of § 20 [33 U.S.C. § 920(a)] cannot, as appellant urges, bring an injury within the coverage of the Act under the admitted facts involved here [cf.: O'Keeffe v. Smith, etc., 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965); Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947); Davis v. Dept. of Labor, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942)]; for as the Court has often observed, when the finding of the Deputy Commissioner is erroneous as a matter of law, it must be set aside [see Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430 (1944)].

Finally, appellant contends that we should construe the Act to be an exercise of the complementary powers of the Congress under both the "Commerce Clause" [U.S.Const. Art. I, § 8] and the "Admiralty Clause" [id., Art. III, § 2]. It is true, of course, as pointed out in appellant's scholarly brief, that: "The two powers are entirely distinct, either or both may be invoked, and neither limits the other." [See: The Lottawanna, 88 U.S. (21 Wall.) 558, 577, 22 L.Ed. 654 (1874); The Genesee Chief, 53 U.S. (12 How.) 443, 452, 13 L.Ed. 1058 (1851); United States v. Coombs, 37 U.S. (12 Pet.) 72, 76–79, 9 L.Ed. 1004 (1838); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 189–192, 6 L.Ed.2d 23 (1824).] But we share the view of Judge Beeks that, if the Commerce Clause is to be invoked to extend the coverage of the Longshoremen's and Harbor Workers' Compensation Act, the Congress and not the courts should so decide. [See Berryhill v. Pacific Far East Line, 238 F.2d 385 (9th Cir. 1956).]

Affirmed.