## TUCKER *v.* ALEXANDROFF.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 303.  Argued November 15, 18, 1901.—Decided January 6, 1902.

Alexandroff, a conscript in the Russian naval service, was sent as one of a detail of fifty-three men to Philadelphia, to become a part of the crew of a Russian cruiser then under construction at that port.  On his arrival at Philadelphia, the vessel was still upon the stocks, but was shortly thereafter launched, and continued for some months in the water still under construction.  Alexandroff, who had remained during the winter at Philadelphia in the service and under the pay of the Russian Government, deserted the following spring, went to New York, renounced his allegiance to the Emperor, declared his intention of becoming a citizen of the United States, and obtained employment.  Shortly thereafter, he was arrested as a deserter from a Russian ship of war, and committed to prison, subject to the orders of the Russian Vice Consul or commander of the cruiser.  On writ of *habeas corpus*, it was *held:*

(1) That although the cruiser was not a ship when Alexandroff arrived at Philadelphia, she became such upon being launched;

(2) That, under the treaty with Russia of 1832, in virtue of which these proceedings were taken, she was a ship of war as distinguished from a merchant vessel, notwithstanding she had not received her equipment or armament, and was still unfinished;

(3) That, under her contract of construction, she was from the beginning, and continued to be, the property of the Russian Government, and was, therefore, a Russian ship of war, notwithstanding she had not received her crew on board, nor been commissioned for active service, and was still in process of completion;

(4) That Alexandroff, having been detailed to her service, was, from the time she became a ship, a part of her crew within the meaning of the treaty;

(5) That the exhibition of official documents, showing that he was a ' member of her crew, had been waived by his admissions.

While desertion is not a crime provided for in our ordinary extradition treaties with foreign nations, the arrest and return to their ships of deserting seamen is required by our treaty with Russia and by other treaties with foreign nations. Query: Whether in the absence of a treaty, courts have power to order the arrest and return of seamen deserting from foreign ships ?

While foreign troops entering or passing through our territory with the permission of the Executive are exempt from territorial jurisdiction, it is doubtful whether in the absence of a treaty or positive legislation to that effect, there is any power to apprehend or return deserters.

The treaty with Russia containing a convention upon that subject, such convention is the only basis upon which the Russian Government can lay a claim for the arrest of deserting seamen. The power contained in the treaty cannot be enlarged upon principles of comity to embrace cases not contemplated by it.

A treaty is to be interpreted liberally and in such manner as to carry out its manifest purpose.

A ship becomes such when she is launched, and continues to be such so long as her identity is preserved: From the moment she takes the water, she becomes the subject of admiralty jurisdiction.

A seaman becomes one of the crew of a merchant vessel from the time he signs the shipping articles, and of a man of war from the time he is detailed to her service.

THIS was a writ of *habeas corpus* issued upon the petition of Alexandroff, to inquire into the cause of his detention by Robert C. Motherwell, keeper of the Philadelphia County Prison, and Captain Vladimir Behr, master of the Russian cruiser Variag.

The petition set forth that the petitioner was illegally de-

tained upon a commissioner's warrant, issued upon the affidavit of Captain Behr, to the effect that he was a duly engaged seaman of the Russian cruiser Variag, whose term of service had not expired; and that he had on or before April 25, 1900, deserted from said vessel, without any intention of returning thereto. Petitioner further averred that on May 24, 1900, he had declared his intention before the proper authorities to become a citizen of the United States, and to renounce his allegiance to the Emperor of Russia, of whom he was then a subject; that he had never deserted the Variag and had "never set his foot on that vessel as a seaman thereof."

In return to the writ the superintendent of the county prison produced the body of Alexandroff, with a copy of the commitment by a United States commissioner, stating that he had been "charged" on oath with desertion from the Variag, and "apprehended" upon a warrant issued by the commissioner at the request of the vice-consul, in accordance with the terms of a treaty between the United States and Russia. There was no statement that an examination had been had before the commissioner, and the warrant did not commit him for examination, but "subject to the order of the Russian vice-consul at Philadelphia or of the master of the cruiser Variag, or until he shall be discharged by the due course of law." The commitment is reproduced in full in the margin.[1]

---

[1] *Copy of Commitment.*

*United States of America,* } *sct.*
. Eastern District of Pennsylvania, }

The President of the United States of America to the marshal of said district and to the keeper of the criminal apartment of the Philadelphia county prison at Moyamensing:

These are to command you, the said marshal, forthwith to deliver into the custody of the said keeper the body of Leo Alexandroff, charged on oath before Henry R. Edmunds, United States commissioner, with desertion from the Imperial Russian cruiser Variag, and apprehended upon my warrant issued at the request of the vice-consul of Russia at Philadelphia upon the complaint of the captain of said cruiser Variag in accordance with the terms of the treaty between the United States and Russia—with the act of Congress in such case made and provided.

And you, the said keeper of the said prison, are hereby required to receive the said Leo Alexandroff into your custody in the said prison and—

Upon a hearing upon the writ, the return thereto and the evidence, the District Court was of opinion, first, that the Variag was not, at the time the petitioner left the service, a Russian ship of war, but simply an unfinished vessel intended for a Russian cruiser; second, that petitioner had not become a member of her crew; that the vessel had no crew in the sense intended by the treaty, inasmuch as the men assigned to that duty had not yet begun that service and might never be called upon to perform it; third, that no such documentary evidence of petitioner's enlistment as a member of the crew, as was required by the treaty, had been offered.

It was accordingly ordered that the prisoner be discharged from custody. 103 Fed. Rep. 198.

An appeal was taken from this order to the Circuit Court of Appeals, in which court the district attorney entered his appearance and filed a suggestion that, under the facts of the case, the relator should be remanded to the county prison to await the order of Captain Behr, the master of the Variag.

Upon a hearing in the Court of Appeals, the order of the District Court was affirmed. 107 Fed. Rep. 137. Whereupon William R. Tucker, vice-consul of Russia at Philadelphia, applied for and was granted a writ of certiorari from this court.

*Mr. John F. Lewis* and *Mr. Paul Fuller* for Tucker. *Mr. F. R. Coudert, Jr.,* was on their brief.

*Mr. Bernard Harris* and *Mr. Isaac Hassler* for Alexandroff.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

Upon the facts of this case, the District Court and Court of

---

the same safely keep him subject to the order of the Russian vice-consul at Philadelphia or of the master of the cruiser Variag, or until he shall be discharged by the due course of law.

Witness the hand and seal of the said commissioner at Philadelphia this first day of June, A. D. 1900, and in the 124th year of the Independence of the United States.

Copy. , HENRY R. EDMUNDS,
[SEAL.] *United States Commissioner.*

Appeals were agreed in the opinion that neither under terms of the treaty of 1832 with Russia nor upon principles of international comity could the relator be delivered over to the master of the Variag as a deserter.

In committing him to the Philadelphia County Prison, the commissioner acted in pursuance of Rev. Stat. sec. 5280, which provides as follows : " Sec. 5280. On application of a consul or vice-consul of any foreign government having a treaty with the United States stipulating for the restoration of seamen deserting, made in writing, stating that the person therein named has deserted from a vessel of any such government, while in any port of the United States, and on proof by the exhibition of the register of the vessel, ship's roll, or other official document, that the person named belonged, at the time of desertion, to the crew of such vessel, it shall be the duty of any court, judge, commissioner of any Circuit Court, justice, or other magistrate, having competent power, to issue warrants to cause such person to be arrested for examination." The procedure is then set forth.

The facts were, in substance, that Alexandroff entered the Russian naval service as a conscript, in 1896, at the age of seventeen, and was assigned to the duties of an assistant physician. Some time in October, 1899, an officer and a detail of fifty-three men, among whom was Alexandroff, were sent from Russia to Philadelphia to take possession of and man the Variag, then under construction by the firm of Cramp & Sons, in that city. The Variag was still upon the stocks when the men arrived in Philadelphia. She was, however, launched in October or November, 1899, and at the time Alexandroff deserted was lying in the stream still under construction, not yet having been accepted by the Russian government. Alexandroff left Philadelphia without leave April 20, 1899, went to New York, and there renounced his allegiance to the Emperor of Russia, declaring his intentions of becoming a citizen of the United States. He was subsequently arrested upon the written request of the Russian vice-consul, and on June 1, 1900, was committed upon a mittimus stating that he had been charged with desertion from the Imperial Russian crusier Variag, upon the complaint of the

captain, in accordance with the terms of the treaty between the United States and Russia.

The vice-consul, who prosecutes this appeal on behalf of the Russian government, relies chiefly upon Art. IX of the treaty of December, 1832, which reads as follows (8 Stat. 444): "The said Consuls, Vice-Consuls and Commercial Agents are authorized to require the assistance of the local authorities, for the search, arrest, detention and imprisonment of the deserters from the ships of war and merchant vessels of their country. For this purpose they shall apply to the competent tribunals, judges and officers, and shall in writing demand said deserters, proving by the exhibition of the registers of the vessels, the rolls of the crews, or by other official documents, that such individuals formed part of the crews; and, this reclamation being thus substantiated, the surrender shall not be refused." Sections VIII and IX of the treaty, which cover the whole subject of deserting seamen, are reproduced in the margin.[1]

---

[1] TREATY WITH RUSSIA, 1832.

Art. VIII.

The Consuls, Vice-Consuls and Commercial Agents shall have the right, as such, to sit as judges and arbitrators in such differences as may arise between the captains and crews of the vessels belonging to the nation whose interests are committed to their charge, without the interference of the local authorities, unless the conduct of the crews or of the captain should disturb the order of the tranquility of the country or the said Consuls, Vice-Consuls or Commercial Agents should require their assistance to cause their decisions to be carried into effect or supported. It is, however, understood that this species of judgment or arbitration shall not deprive the contending parties of the right they have to resort, on their return, to the judicial authority of their country.

Art. IX.

The said Consuls, Vice-Consuls and Commercial Agents are authorized to require the assistance of the local authorities for the search, arrest, detention and imprisonment of the deserters from the ships of war and merchant vessels of their country. For this purpose they shall apply to the competent tribunals, judges and officers, and shall in writing demand said deserters, proving, by the exhibition of the registers of the vessels, the rolls of the crews, or by any other official documents, that such individuals formed part of the crews; and this reclamation being thus substantiated, the surrender shall not be refused.

Such deserters, when arrested, shall be placed at the disposal of the said

While desertion is not a *crime* provided for by any of our numerous extradition treaties with foreign nations, the arrest and return to their ships of deserting seamen is no novelty either in treaties, legislation or general international jurisprudence. The ninth article of the treaty with the government of France, entered into November 14, 1788, before the adoption of the Constitution, contained a stipulation that "the Consuls and Vice-Consuls may cause to be arrested the captains, officers, mariners, sailors and all other persons, being part of the crews of the vessels of their respective nations, who shall have deserted from the said vessels, in order to send them back and transport them out of the country," specifying the procedure. 3 Stat. 106, 112. The same provision was contained in subsequent treaties with France, of June 24, 1822, and February 23, 1853, and it was to carry these and similar treaties into effect that the act of 1829, reproduced in Rev. Stat. sec. 5280, was adopted. Similar conventions were entered into with Brazil in 1828, Mexico in 1831, Chili in 1832, Greece in 1837, Bolivia in 1858, Austria in 1870, Belgium in 1880, and at different times with some seventeen or eighteen other powers, and finally by a special treaty with Great Britain, ratified June 3, 1892. In short, it may be said that with the exception of China, the Argentine Republic, and possibly a few others, there is not a maritime nation in the world with which we have not entered into a convention for the arrest and delivery over of deserting seamen. The multitude of these conventions is such as to indicate a pressing necessity that masters of vessels should have some recourse to local laws to prevent their being entirely stripped of their crews in foreign ports.

A like provision for the arrest and delivery over of seamen deserting from domestic vessels, adopted by the first Congress

---

Consuls, Vice-Consuls or Commercial Agents, and may be confined in the public prisons, at the request and cost of those who shall claim them, in order to be detained until the time when they shall be restored to the vessels to which they belong, or sent back to their own country by a vessel of the same nation or any other vessel whatsoever. But if not sent back within four months from the day of their arrest, they shall be set at liberty, and shall not be again arrested for the same cause.

in 1790, 1 Stat. 131, 134, was sustained by this court in *Robertson* v. *Baldwin*, 165 U. S. 275, and remained upon the statute books for over a hundred years, when it was finally repealed in 1898. 30 Stat. 755, 764.

We are cited to no case holding that courts have the power, in the absence of treaty stipulations, to order the arrest and return of seamen deserting from foreign ships; and it would appear there was no such power in this country, inasmuch as sec. 5280, under which the commissioner is bound to proceed, limits his jurisdiction to applications by a consul or vice-consul of a foreign government *"having a treaty with the United States"* for that purpose.

In Moore on Extradition, (sec. 408,) it is laid down as a general proposition that, in the absence of a treaty, the surrender of deserting seamen cannot be granted by the authorities of the United States; and an opinion of Attorney General Cushing, (6 Op. 148,) is cited upon that point. There is also another to the same effect. (6 Op. 209.) It is believed that in all the instances which arose between the United States and Great Britain prior to the treaty of 1892 for the reclamation of deserting seamen, both powers have taken the position that in the absence of a treaty there can be no reclamation. Several instances of this kind are cited by Mr. Moore in his treatise.

In the case of the *United States* v. *Rauscher*, 119 U. S. 407, it was held that, apart from the provisions of treaties upon the subject, there was no well-defined obligation on the part of one country to deliver up fugitives from justice to another, "and though such delivery was often made, it was upon the principle of comity, and within the discretion of the government whose action was invoked, and it has never been recognized as among those obligations of one government towards another which rest upon established principles of international law."

The only case in our reports even indirectly considering such a case as one of international comity is that of *The Exchange*, 7 Cranch, 116. This was a libel for possession promoted by the former owners of the Exchange, who alleged that she had been seized under the orders of Napoleon and in violation of the law of nations; that no decree of condemnation had been pro-

nounced against her, but that she remained the property of the libellants.

The district attorney filed a suggestion to the effect that the vessel, whose name had been changed, belonged to the Emperor of the French, and while actually employed in his service was compelled, by stress of weather, to enter the port of Philadelphia for repairs; that if the vessel had ever belonged to the libellants, their title was divested according to the decrees and laws of France in such case provided. The District Judge dismissed the libel upon the ground that a public armed vessel of a foreign sovereign in amity with our government is not subject to the ordinary judicial tribunals of our country, so far as regards the question of title, by which such sovereign holds the vessel.

On appeal, this court, through Mr. Chief Justice Marshall, held that the decree of the District Court should be affirmed; that the "perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation." He divided these cases into three classes:

1. The exemption of the person of the sovereign from arrest or detention in a foreign country.

2. The immunity which all civilized nations allow to foreign ministers.

3. Where the sovereign allows the troops of a foreign prince to pass through his dominions.

In respect to this last class he observed: "In such case, without any express declaration waiving jurisdiction over the army to which this right of passage has been granted, the sovereign who should attempt to exercise it would certainly be considered as violating his faith. By exercising it, the purpose for which the free passage was granted would be defeated, and a portion of the military force of a foreign independent nation would be diverted from those national objects and duties to which it was

applicable, and would be withdrawn from the control of the sovereign whose power and whose safety might greatly depend on retaining the exclusive command and disposition of this force. The grant of a free passage, therefore, implies a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline, and to inflict those punishments which the goverment of his army may require."

In this connection he held that there was a distinction between a military force which could only enter a foreign territory by permission of the sovereign, and a public armed vessel, which upon principles of international comity is entitled to enter the ports of any foreign country with which her own country is at peace. He further observed: "If there be no prohibition, the ports of a friendly nation are considered as open to the public ships of all powers with whom it is at peace, and they are supposed to enter such ports, and to remain in them while allowed to remain under the protection of the government of the place." It was upon this ground that the court held the Exchange exempt from seizure.

This case, however, only holds that the public armed vessels of a foreign nation may, upon principles of comity, enter our harbors with the presumed license of the government, and while there are exempt from the jurisdiction of the local courts; and, by parity of reasoning, that, if foreign troops are permitted to enter, or cross our territory, they are still subject to the control of their officers and exempt from local jurisdiction.

The case, however, is not authority for the proposition that, if the crews of such vessels, or the members of such military force, actually desert and scatter themselves through the country, their officers are, in the absence of treaty stipulation, authorized to call upon the local authorities for their reclamation. While we have no doubt that, under the case above cited, the foreign officer may exercise his accustomed authority for the maintenance of discipline, and perhaps arrest a deserter *dum fervet opus*, and to that extent this country waives its jurisdiction over the foreign crew or command, yet if a member of that crew actually escapes from the custody of his officers, he

commits no crime against the local government, and it is a grave question whether the local courts can be called upon to enforce what is in reality the law of a foreign sovereign. The principle of comity may imply the surrender of jurisdiction over a foreign force within our territory, but it does not necessarily imply the assumption by our courts of a new jurisdiction, invoked by a foreign power, for the arrest of persons who have committed no offence against our laws, and are perhaps seeking to become citizens of our country. Our attention has been called to no such case. But, however this may be, there can be no doubt that the commissioner, in exercising the powers vested in him by Rev. Stat. sec. 2580, is limited to the arrest of seamen belonging to a country with whom we have a treaty upon that subject.

Instances are by no means rare where foreign troops have been permitted to enter or cross our territory, although in September, 1790, General Washington, on the advice of Mr. Adams, did refuse to permit British troops to march through the territory of the United States from Detroit to the Mississippi, apparently for the reason that the object of such movement was an attack on New Orleans and the Spanish possessions on the Mississippi. The Government might well refuse the passage of foreign troops for the purpose of making an attack upon a power with which we were at peace.

In January, 1862, the Secretary of State gave permission to the British government to land a body of troops at Portland, and to transport them to Canada, the St. Lawrence being closed at that season of the year. The concession was the more significant from the fact that it occurred during our civil war, when our relations with Great Britain were considerably strained, and the object was evidently to strengthen the British garrisons in Canada.

In 1875, permission was granted to the Governor General of Canada to transport through the territory of the United States certain supplies for the use of the Canadian mounted police force.

In 1876, the President permitted Mexico to land in Texas a small body of her troops, supposed to be intended to aid in the

defence of Matamoras, with the proviso that the stay be not unnecessarily long, and that the Mexican government should be liable for any injury inflicted by these troops.

By a reciprocity of courtesy, permission was given in 1881 by the Governor General of Canada for the passage of a company of Buffalo militia, armed and equipped, over the Canada Southern Railway, from Buffalo to Detroit. These and other instances are collected by Dr. Wharton in his Digest of International Law, section 13.

Our attention is also called by counsel to the following instances:

At the Columbian celebration in 1893 marines from every foreign war vessel, except the Spanish, were allowed to land and did land and parade in the public streets of New York under the control of their various commanders.

On the occasion of the Dewey parade, a regiment of Canadian troops was given permission to come into the United States and join in the procession.

This permission was granted as in the present case by the Secretary of the Treasury.

At the Buffalo Exposition, but recently closed, Mexican troops were allowed to go through the United States and be present at Buffalo, and remain there during the exposition.

In none of these cases, however, did a question arise with respect to the immunity of foreign troops from the territorial jurisdiction, or the power of their officers over them, or the right of the latter to call upon the local officers for the arrest of deserters. While no act of Congress authorizes the executive department to permit the introduction of foreign troops, the power to give such permission without legislative assent was probably assumed to exist from the authority of the President as commander-in-chief of the military and naval forces of the United States. It may be doubted, however, whether such power could be extended to the apprehension of deserters in the absence of positive legislation to that effect.

If the arrest of Alexandroff were wholly without authority of law, we should not feel it our duty to detain him and deliver him up to the custody of Captain Behr, notwithstanding we

might be of opinion that he had unlawfully escaped from his custody. If Captain Behr by the escape of Alexandroff lost the right to call upon the local authorities for his arrest and surrender, he acquired no new right in that particular by the fact that he was illegally arrested and is still in custody. His detention upon the ground of comity could only be justified by the fact that his original arrest was legal, although if his arrest were authorized by law, the fact that such arrest was irregular might be condoned.

But whatever view might be taken of the question of delivering over foreign seamen in the absence of a treaty, we are of opinion that the treaty with Russia, having contained a convention upon this subject, that convention must alone be looked to in determining the rights of the Russian authorities to the reclamation of the relator. Where the signatory powers have themselves fixed the terms upon which deserting seamen shall be surrendered, we have no right to enlarge those powers upon the principles of comity so as to embrace cases not contemplated by the treaty. Upon general principles applicable to the construction of written instruments, the enumeration of certain powers with respect to a particular subject matter is a negation of all other analogous powers with respect to the same subject matter. *Ex parte McCardle*, 7 Wall. 506 ; Endlich on Stats. secs. 397, 400. As observed by Lord Denham in *Aspdin* v. *Austin*, 5 Ad. & El. (N. S.) 671, 684, " where parties have entered into written engagements with express stipulations, it is manifestly not desirable to extend them by any implications; the presumption is that, having expressed some, they have expressed all the conditions by which they intend to be bound under that instrument." The rule is curtly stated in the familiar legal maxim, *expressio unius est exclusio alterius.* In several recent cases in this court we have held that, where a statute gives a certain remedy for usurious interest paid, that remedy is exclusive, although in the absence of such a remedy the defence might be made by way of set off or credit upon the original demand. *Barnet* v. *National Bank*, 98 U. S. 555 ; *Driesbach* v. *National Bank*, 104 U. S. 52 ; *Stephens* v. *Monongahela Bank*, 111 U. S. 197 ; *Haseltine* v. *Central National Bank*,

*ante*, 130.) See also *King* v. *Sedgley*, 2 Barn. Ad. 65 ; *Hare* v. *Horton*, 5 Ibid. 715 ; *Stafford* v. *Ingersoll*, 3 Hill, 38.

We think, then, that the rights of the parties must be determined by the treaty, but that this particular convention being operative upon both powers and intended for their mutual protection, should be interpreted in a spirit of *uberrima fides*, and in a manner to carry out its manifest purpose. Taylor on International Law, sec. 383. As treaties are solemn engagements entered into between independent nations for the common advancement of their interests and the interests of civilization, and as their main object is not only to avoid war and secure a lasting and perpetual peace, but to promote a friendly feeling between the people of the two countries, they should be interpreted in that broad and liberal spirit which is calculated to make for the existence of a perpetual amity, so far as it can be done without the sacrifice of individual rights or those principles of personal liberty which lie at the foundation of our jurisprudence. It is said by Chancellor Kent in his Commentaries (vol. 1, p. 174): " Treaties of every kind are to receive a fair and liberal interpretation according to the intention of the contracting parties, and are to be kept with the most scrupulous good faith. Their meaning is to be ascertained by the same rules of construction and course of reasoning which we apply to the interpretation of private contracts."

What, then, are the stipulations to which we must look for the solution of the question involved in this case? They are found in the ninth article of the treaty, which authorizes the arrest and surrender of " deserters from the ships of war and merchant vessels of their country." It is insisted, however, that this article is no proper foundation for the arrest of Alexandroff for three reasons : First, that the Variag was not a Russian ship of war; second, that Alexandroff was not a deserter from such ship ; and, third, that his membership of such crew was not proven by the exhibition of registers of vessels, the rolls of the crew, or by other official documents The case depends upon the answers to these questions.

1. At the time Alexandroff arrived in Philadelphia, the Variag was still upon the stocks. Whatever be the proper construction

of the word under the treaty, she was not then a *ship* in the ordinary sense of the term, but shortly thereafter and long before Alexandroff deserted, she was launched, and thereby became a ship in its legal sense. A ship is born when she is launched, and lives so long as her identity is preserved. Prior to her launching she is a mere congeries of wood and iron—an ordinary piece of personal property,—as distinctly a land structure as a house, and subject only to mechanics' liens created by state law and enforcible in the state courts. In the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction. She acquires a personality of her own; becomes competent to contract, and is individually liable for her obligations, upon which she may sue in the name of her owner, and be sued in her own name. Her owner's agents may not be her agents, and her agents may not be her owner's agents. *The China,* 7 Wall. 53; *Thorp* v. *Hammond,* 12 Wall. 408; *Workman* v. *New York City,* 179 U. S. 552; *The Little Charles,* 1 Brock. 347, 354; *The John G. Stevens,* 170 U. S. 113, 120; *Homer Ramsdell Co.* v. *Comp. Gen. Trans.,* 182 U. S. 406. She is capable, too, of committing a tort, and is responsible in damages therefor. She may also become a *quasi* bankrupt; may be sold for the payment of her debts, and thereby receive a complete discharge from all prior liens, with liberty to begin a new life, contract further obligations, and perhaps be subjected to a second sale. We have had frequent occasion to notice the distinction between a vessel before and after she is launched. In *The Jefferson, People's Ferry Company* v. *Beers,* 20 How. 393, it was held that the admiralty jurisdiction did not extend to cases where a lien was claimed for work done and materials used in the construction of a vessel; while the cases holding that for repairs or alterations, supplies or materials, furnished after she is launched, suit may be brought in a court of admiralty, are too numerous for citation.

So sharply is the line drawn between a vessel upon the stocks and a vessel in the water, that the former can never be made liable in admiralty, either *in rem* against herself or *in personam* against her owners, upon contracts or for torts, while if, in taking

the water during the process of launching, she escapes from the control of those about her, shoots across the stream and injures another vessel, she is liable to a suit *in rem* for damages. *The Blenheim*, 2 W. Rob. 421; *The Vianna*, Swab. 405; *The Andalusian*, 2 P. D. 231; *The Glengarry*, 2 P. D. 235; *The George Roper*, 8 P. D. 119; *Baker* v. *Power*, 14 Fed. Rep. 483.

Inasmuch as the Variag had been launched and was lying in the stream at the time of Alexandroff's desertion, we think she was a ship within the meaning of the treaty.

It requires no argument to show that if she were a ship of any description, she was a ship of war as distinguished from a merchant vessel. Article IX of the treaty embraces deserters from both classes of vessels. She was clearly not a merchant vessel, and as clearly intended to be and was a ship of war, notwithstanding she had not received hér armament. The contract with the Cramps under which she was built was entered into by the Russian Ministry of Marine, and provided for the construction by them for the Russian Imperial Government of "a protected cruiser, built, equipped, armed and fitted," etc. The appearance of a modern ship of war, too, is so wholly distinct from that of a merchant vessel, that there could be no possibility of mistaking one for the other.

We are also of opinion that she was a Russian ship of war within the meaning of the treaty. The contract under which she was built not only provided that she was to be built for the Imperial Russian Government, but should be constantly, during the continuance of the contract, inspected by a board of inspection appointed by the Russian Ministry of Marine, who should have full liberty to enter the premises of the contractors for such purpose; and that speed trials should be made by the contractors in the presence of such board of inspection. The tenth article of the contract reads as follows:

"Art. 10. The contractors agree, that the vessel to be built, as aforesaid, whether finished or unfinished, and all steel, iron, timber and other materials as may be required by the contractors, and be intended for the construction of the said ship, and

which may be brought upon the premises of the contractors, shall immediately thereupon become, and be, the exclusive property of the Russian Ministry of Marine. The flag of the Imperial Russian Government shall be hoisted on the said ship, whenever desired by the board of inspection, as evidence that the same is said government's exclusive property, and the Russian Ministry of Marine may at any time appoint an officer or officers to take actual possession of the said ship or materials, whether finished or unfinished, subject to the lien of the contractors for any portion of the value that may be unpaid."

Such being her *status* with respect to her title and employment, can it be doubted that, if the contractors had seen fit to institute proceedings under the mechanics' lien law of the State for labor and materials furnished in her construction, or if a materialman had filed a libel in admiralty against her for coal furnished in testing her engines, or if upon her trial trip she had negligently come into collision with another vessel whose owner had instituted a suit against her, the Emperor of Russia might have claimed for her an immunity from local jurisdiction upon the ground that she was the property of a foreign sovereign? In making this defence it would necessarily appear that she was a public vessel; in other words, a ship of war, and upon that ground immune from suit or prosecution in the local courts. In the case of *The Constitution*, 4 P. D. 39, an historical and venerable frigate of the United States, while returning home from the Paris Exposition with a cargo of American exhibits belonging to private parties, was stranded on the south coast of England and received salvage services from an English tug. It was held by the English Court of Admiralty that no warrant for her arrest could issue, either in respect of ship or cargo. In *The Parlement Belge*, 4 P. D. 129, a vessel belonging to the King of the Belgians, manned by officers and men commissioned and paid by him, and regularly employed for the purposes of carrying mails, passengers and cargo, was held by the British Court of Admiralty not to be entitled to the privileges of a man-of-war as to extraterritoriality, and that she was liable to proceedings *in rem* at the suit of the owner of a vessel injured by her in collision. The decision, however, was re-

versed by the Court of Appeals, upon the ground that the exercise of such jurisdiction was incompatible with the absolute independence of the sovereign of every superior authority, and that the property as well as the person of the sovereign was exempt from suit. This general question is too well settled to admit of doubt.

It is true there was a provision that the Variag might be rejected either for deficient speed or for excessive draft, and that she should be during her construction at the risk of the contractors, until she had been actually accepted by the Imperial Russian Government, or they had taken actual possession of her. This, however, did not prevent the property passing to the Russian Government as stipulated by article X of the contract, though with a provision for an ultimate rescission. True, the Russian flag had never been hoisted upon the vessel, but that was immaterial, as the government had not finally accepted or taken possession of her.

Mr. Hall, in his treatise upon International Law, discussing foreign ships as non-territorial property of a State, (section 44,) says that the commission under which a commander acts is conclusive of the public character of a vessel, although such character is usually evidenced by the flag and pendant which she carries, and, if necessary, by firing a gun. " When in the absence of, or notwithstanding, these proofs any doubt is entertained as to the legitimateness of her claim, the statement of the commander on his word of honor that the vessel is public is often accepted, but the admission of such statements as proof is a matter of courtesy," and " though attestation by a government that a ship belongs to it is final, it does not follow that denial of public character is equally final; assumption and repudiation of responsibility stand upon a different footing." It is true he says that the immunities of a vessel of war belong to her as a complete instrument, made up of vessel and crew, and intended to be used by the state for specific purposes; the elements of which she is composed not being capable of separate use for these purposes, and consequently are not exempted from the local jurisdiction. But it is pertinent to notice here that he is speaking of immunities of public vessels from local juris-

diction, and not of the property of a foreign government in such vessels. See also Taylor on International Law, secs. 253, 254, 261. There can be no doubt that the Variag, in the condition in which she was at the time Alexandroff deserted, was a subject of local jurisdiction, and that if any crime had been committed on board of her, such crime would have been cognizable in the local courts, although it would have been otherwise had the Russian government taken possession, put a crew on board of her, and commissioned her for active service. This, however, does not touch the question whether she was not a ship of war within the letter and spirit of the treaty of 1832.

2. Was Alexandroff a deserter from a Russian ship of war within the meaning of the treaty, or was he merely a deserter from the Russian naval service, a fact which of itself would not be sufficient to authorize his arrest under article IX of the treaty? To be a deserter from a particular ship he must have been a member of the crew of such ship, and bound to remain in its service until discharged. It is earnestly insisted that, although he had been detailed to serve thereafter as a member of the crew of the Variag, her crew had never been organized as such, that the detail was merely preliminary to such organization, and that Alexandroff had never set foot upon the vessel. This argument necessarily presupposes that seamen do not become a "crew" until they have actually gone on board the vessel, and entered upon the performance of their duties. We cannot acquiesce in this position. The more reasonable view is that seamen become obligated to merchant vessels from the time they sign the shipping articles, and from that time they may incur the penalties of desertion.

So early as the marine ordinances of Louis XIV—the foundation of all maritime codes—the service of the seaman was treated as beginning from the moment when the contract for such service was entered into. By title three, article III, of this ordinance, "if a seaman leaves a master, without a discharge in writing, *before the voyage is begun,* he may be taken up and imprisoned wherever he can be found," etc. The present Commercial Code of France makes no express provision upon the subject, but by the general mercantile law of Germany, art. 532,

" The master can cause any seaman, who, *after having been engaged*, neglects to enter upon or continues to do his duties, to be forcibly compelled to perform the same." By the Dutch code, art. 402, "The master, or his representative, can call in the public force against those *who refuse to come on board*, who absent themselves from the ship without leave, and refuse to perform to the end of the service for which they were engaged."

The rule is the same in England. By section 243 of the Merchants' Shipping Act of 1854, (17 & 18 Vic. chap. 104,) whenever any seaman, *who has been lawfully engaged*, or any apprentice to the sea service, commits any of the following offences, he shall be liable to be punished summarily, as follows, (that is to say): 2. For *neglecting or refusing*, without reasonable cause, *to join his ship*, or to proceed to sea in his ship, or for absence without leave at any time within twenty-four hours of the ship's sailing from any port, either at the commencement or during the progress of any voyage, . . . he shall be liable to imprisonment," etc. And by section 246, "Whenever, either at the commencement or during the progress of any voyage, any seaman or apprentice *neglects or refuses to join*, or deserts from or refuses to proceed to sea in any ship in which he is duly engaged to serve, the master may call upon the local police officers or constables to apprehend him." These provisions have been substantially carried into the new Merchants' Shipping Act. 57 & 58 Vic. chap. 60, sec. 221.

Congress, however, has so often spoken upon this subject that we think it can hardly be open to doubt. By Rev. Stat. sec. 4522, as amended in 1898, (30 Stat. 755,) regulating seamen engaged in interstate commerce, there is a provision that " at the foot of every such contract to ship upon such a vessel . . . there shall be a memorandum in writing of the day and the hour when such seaman who shipped and subscribed shall render himself on board to begin the voyage agreed upon. If any seaman shall neglect *to render himself on board the vessel* for which he has shipped at the time mentioned in such memorandum," and if the master shall make a proper entry in the log book, " then every such seaman shall forfeit for every hour which he shall so neglect to render himself one half of one day's pay."

The rights of the seaman in this connection are protected by section 4527, which declares that " any seaman who has signed an agreement and who is afterwards *discharged before the commencement of the voyage* or before one month's wages are earned," shall be entitled to compensation.   By section 4558, as amended, (30 Stat. 757,) if, after judgment, that such vessel is fit to proceed on her intended voyage,  .  .  .  the seamen, or either of them, *shall refuse to proceed on the voyage,* he shall forfeit any wages that may be due him.   Section 4596 is largely a reproduction of the section above cited from the Merchants' Shipping Act, and provides that " whenever any seaman who has been lawfully engaged  .  .  .  commits any of the following offences he shall be punishable as follows :  Second. · For *neglecting or refusing,* without reasonable cause, *to join his vessel* or to proceed to sea in his vessel, or for absence without leave at any time within twenty-four hours of the vessel's sailing from any port, either at the commencement or during the progress of any voyage," he shall forfeit his wages.   By section 4599, " whenever, either at the commencement of or during any voyage any seaman or apprentice *neglects or refuses to join,* or deserts from or refuses to proceed to sea in, any vessel in which he is duly engaged to serve," the master may [in accordance with the English practice] apply for the local assistance of police officers or constables for his arrest and detention.   It is true this section has been repealed, together with all other provisions authorizing the arrest and surrender to the vessel of seamen of domestic vessels deserting in this country.   But throughout all this legislation there is a recognition of the principle that the obligation of the seaman begins with the signing of the shipping articles, and that he is liable to the penalty of a forfeiture of his wages from that moment.

Upon these authorities we are of opinion that, as applied to merchant vessels, the crews are organized and the service of each sailor begins with the signing of the shipping articles, and that the lien of the seaman upon the ship for his wages, and reciprocally the lien of the ship upon the seaman for his services, where such lien still exists, dates from that time.   The difficulty of securing a crew would be greatly enhanced if, after

signing the articles and perhaps drawing advance pay, seamen were at liberty to desert before rendering themselves on board.

The Variag being a ship of war, there was no signing of shipping articles, as required in the merchant service, since the seamen were enlisted or conscribed to serve where ordered. But there was a practical equivalent for the shipping articles in the detail of Alexandroff to this vessel. He entered the Russian naval service in 1896, and his term of service had not expired. He was, of course, subject to the orders of his officers, and was sent as a member of a force of one officer and fifty-three men ordered to take possession of the Variag as soon as she was completed. From the moment of such assignment and until relieved therefrom, he was as much bound to the service of the Variag, and a member of her crew, as if he had signed shipping articles. We express no opinion as to whether, if the Variag had not been launched when he deserted, he could be held as a member of her crew, but when she took the water and became a ship she was competent to receive a crew, and a detail to her service took effect. It will scarcely be disputed that, if the Variag had been in commission and this body of men had gone on board the vessel and rendered some slight service as seamen, and had subsequently gone ashore to remain until she was ready for her final departure from Philadelphia, they would be regarded as a component part of her crew; but this differs in form rather than in substance from what actually took place. The men were in Philadelphia in custody of Captain Behr, and ready to go on board at a moment's notice. They were as much subject to his orders as if they had remained on board the Variag; and as much so as if she had been a regularly commissioned vessel of the Russian Navy, which had put into Philadelphia for repairs and sent her crew ashore as the most convenient method of disposing of them while such repairs were being made.

We do not regard it as material that the Variag had not yet been commissioned as a member of the Russian Navy. The mere commissioning of a ship does not make her a ship of war, but merely indicates that she is assigned to active service. A merchant vessel, built for the purpose of trade and commerce,

is a merchant vessel, though she may not yet have received her register—a formality only necessary to entitle her to the privileges of an American vessel. To hold that the treaty applies only to commissioned vessels of war is to introduce into it a new element and to rob it of a valuable feature. Under the contract with the builders she was clearly Russian property, and while ownership is not always proof of nationality, since a vessel may be owned in one country and registered in another, where the facts are undisputed, and there was no pretence she was an American vessel, her Russian nationality follows as a matter of course. If she went out of commission and her armament were taken out of her for a temporary purpose, she would nevertheless be a ship of war of the Russian Navy. Being, as we have already held, a *ship*, she must be either a ship of war or merchant vessel, and as she was clearly not a merchant vessel, the only other alternative applies. The treaty should be liberally interpreted in this particular to carry out the intent of the parties, since if a foreign government may not send details of men to take possession of vessels built here, without danger of losing their entire command by desertion, we must either cease building them or foreign governments must send special ships of their own with crews ordered to take possession of them. It is true that possession of the Variag had not yet been delivered, but the title had passed, and the very fact that the Russian Government had detailed a crew to take possession of her indicated that it regarded her as a constituent part of the Russian Navy. It is unnecessary to consider whether, if the Variag had been rejected, her crew would have been *eo instanti* at liberty to leave the Russian service and acquire a citizenship here. That probably would have involved the other question, whether they could be treated as a military force entering this country with the permission of the Executive and remaining subject to the orders of their officers.

Holding, as we do, that the rights of the parties must be determined by the treaty, the manner in which this body of men entered the country does not seem to be material, so long as it appears that they were detailed as part of the crew of the Variag. If they were not here as a military force, which had

landed with the permission of the government, they were lawfully here as individual seamen directed to take possession of the Variag, and the purpose of their coming was of no moment to the authorities. It appears, however—and it is not improper to allude to it here—that, as the Variag approached her completion, the naval agent of the Russian Embassy to the United States addressed a letter to the Secretary of the Treasury, requesting that the necessary orders be given for allowing "admittance to the United States, through the port of New York, without examination, the detail of one officer and fifty-three regular sailors, Imperial Russian Navy, detailed to this country for the purpose of partly manning the cruiser," etc. In reply, the Acting Secretary of the Treasury issued instructions to the Commission of Immigration to admit the detail without examination for the purposes named, and to remit the usual head tax of one dollar.

3. The only remaining question is whether there was a compliance with article IX of the treaty, that the vice-consul "shall in writing demand said deserters, proving, by the exhibition of the registers of the vessels, the rolls of the crews, or by any other official documents, that such individuals formed part of the crews; and this reclamation being thus substantiated, the surrender shall not be refused." We have no doubt this provision is obligatory, and that the vice-consul must show either that it was complied with or that a compliance was waived. We are not informed by the record what evidence was laid before the commissioner upon this subject. Alexandroff himself, however, swears that he entered the naval service in 1896 as an assistant physician; that he arrived in the United States October 14, 1899; that he never asked to become a member of the crew, but was simply sent to the United States and lived with the crew of the Russian ship, received his equipment, support and wages; that he left the crew on April 20, 1900, went to New York, declared his intention to become a citizen, and obtained employment. On cross examination he stated that a subject is not required to sign any enlistment or anything of that kind, but is simply sent into the service. After the oral

testimony had been introduced, the Russian vice-consul, to further sustain his case, made the following offer:

"Mr. Adler: I also have here the Russian officer who accompanied these fifty-three sailors to this country, together with the other members of the crew, who has with him the passport issued by his government entitled these men to come here. I understand it is admitted by the other side that this defendant did come here as a portion of the crew of this cruiser, and the passport so states. If that is admitted, I presume it is not necessary to offer the passport in evidence. If your honor cares to have it, I will produce this officer with the passport and offer it. It merely shows that this defendant, with fifty-two other members of a company in the Russian Navy, were admitted to free passage here to become members of the crew of the cruiser Variag, and that he came here in pursuance of that passport accompanied by this officer.

"Mr. Hassler: I should object to the officer, not so much on account of what is in the passport, but my friend made a statement which I do not think is exactly accurate, as to what we stated. We stated this man came here with a company of men, but we do not state that he came here as part of the crew of the Variag.

"The Court: He came here as a member of the Russian Navy, ordered here to become one of the crew of the cruiser Variag, and he came for that express purpose.

"Mr. Hassler: We concede that."

There was here a clear waiver of the production of the passport and an admission that Alexandroff came to this country as a member of the Russian Navy, was ordered here to become one of the crew of the Variag, and came for that express purpose. Under such circumstances, it does not lie in the mouth of the relator to insist that no official documents were produced, since the passport and the admission accompanying its offer show that Alexandroff came here as a member of the proposed crew of the Variag, (and we have discussed the case upon that assumption)—the question being whether under those circumstances he ought to be treated as a deserter from a Russian ship of war.

*We are of opinion that this case is within the treaty, and the judgments of both courts below are therefore reversed, and the case remanded to the District Court for the Eastern District of Pennsylvania for further proceedings consistent with this opinion.*

MR. JUSTICE PECKHAM concurred in the opinion, but also thought that the men, among whom was the respondent, came into the country with the expressed permission of the Executive as a part of the Russian Navy and as members of the crew of the steamship awaiting completion as a man-of-war; and the Russian government was, therefore, upon the principle of comity, entitled to the aid of the Government of the United States to accomplish the arrest and detention of a deserter from the ranks of those men it had thus expressly authorized to come in.

MR. JUSTICE GRAY, with whom concurred MR. CHIEF JUSTICE FULLER and JUSTICES HARLAN and WHITE, dissenting.

The Chief Justice, Justices Harlan and White and myself are unable to concur in the opinion and judgment of the court. The case presents such an important question of international law as to make it fit that the grounds of our opinion should be stated. It is necessary to a proper determination of the case that its precise facts should be borne in mind, and they will therefore be here recapitulated.

This is a writ of certiorari, granted by this court on the application of William R. Tucker, the Russian Vice-Consul at Philadelphia, to review a judgment of the United States Circuit Court of Appeals for the Third Circuit on February 25, 1901, (107 Fed. Rep. 437,) affirming a judgment of the District Court for the Eastern District of Pennsylvania on July 12, 1900, (103 Fed. Rep. 198,) discharging on writ of *habeas corpus* Leo Alexandroff, held in custody under a warrant of commitment issued by a United States commissioner to Robert C. Motherwell, Jr., keeper of the Philadelphia county prison, subject to the order of the Russian Vice-Consul at Philadelphia, or of the master of the Russian cruiser Variag, under section 5280 of the Revised Statutes, which is as follows:

" On application of a consul or vice-consul of any foreign government having a treaty with the United States stipulating for the restoration of seamen deserting, made in writing, stating that the person therein named has deserted from a vessel of any such government, while in any port of the United States, and on proof by the exhibition of the register of the vessel, ship's roll, or other official document, that the person named belonged, at the time of desertion, to the crew of such vessel, it shall be the duty of any court, judge, commissioner of any Circuit Court, justice or other magistrate, having competent power, to issue warrants to cause such person to be arrested for examination. If, on examination, the facts stated are found to be true, the person arrested, not being a citizen of the United States, shall be delivered up to the consul or vice-consul, to be sent back to the dominions of any such government, or, on the request and at the expense of the consul or vice-consul, shall be detained until the consul or vice-consul finds an opportunity to send him back to the dominions of any such government. No person so arrested shall be detained more than two months after his arrest; but at the end of that time shall be set at liberty, and shall not be again molested for the same cause. If any such deserter shall be found to have committed any crime or offence, his surrender may be delayed until the tribunal before which the case shall be depending, or may be cognizable, shall have pronounced its sentence, and such sentence shall have been carried into effect."

The treaty of the United States with the Emperor of Russia of December 18, 1832, provides, in article 9, as follows:

" The said consuls, vice-consuls and commercial agents are authorized to require the assistance of the local authorities for the search, arrest, detention and imprisonment of the deserters from the ships of war and merchant vessels of their country. For this purpose they shall apply to the competent tribunals, judges and officers, and shall in writing demand said deserters, proving by the exhibition of the registers of the vessels, the rolls of the crews, or by other official documents, that such individuals formed part of the crews; and this reclamation being thus substantiated, the surrender shall not be refused. Such

deserters, when arrested, shall be placed at the disposal of the said consuls, vice-consuls or commercial agents, and may be confined in the public prisons, at the request and cost of those who shall claim them, in order to be detained until the time when they shall be restored to the vessels to which they belonged, or sent back to their own country by a vessel of the same nation or any other vessel whatsoever. But if not sent back within four months from the day of their arrest, they shall be set at liberty, and shall not be again arrested for the same cause. However, if the deserter should be found to have committed any crime or offence, his surrender may be delayed until the tribunal before which his case shall be depending shall have pronounced its sentence, and such sentence shall have been carried into effect." 8 Stat. 448.

The warrant of commitment in this case was issued by the commissioner on June 1, 1900, on the application of the Vice-Consul of Russia at Philadelphia, upon the affidavit of Captain Vladimir Behr, stating that he was master of the Russian cruiser Variag, then in the port of Philadelphia, and that Alexandroff was a duly engaged seaman of that vessel, and on or before April 25, 1900, had deserted from her without any intention of returning.

The Variag was built under a contract in writing, dated April 23, 1898, between the William Cramp and Sons Ship and Engine Building Company of Philadelphia, Pennsylvania, and the Russian Ministry of Marine, by which the Cramp Company agreed to supply for the Imperial Russian Navy a protected crusier, built, equipped, armed and fitted, (except the ordnance and torpedo outfit,) subject to the approval of a board of inspectors appointed by the Russian Ministry of Marine. That contract contained the following provisions:

"ART. 8. Trials to determine the speed of the vessel shall be made by the contractors, in the presence of the board of inspection, and at the cost of the contractors, who agree to insure the vessel against sea risks and all other risks of every description during the trials, and until such time as the vessel is handed over to the exclusive possession and custody of the Russian Ministry of Marine." And if the mean speed should be less

than twenty-one knots per hour, or the actual draught of water in any part of the ship should exceed the contract draught by one foot, it should be optional with the Russian Ministry of Marine to reject the ship.

"ART. 10. The contractors agree that the vessel to be built as aforesaid, whether finished or unfinished, and all steel, iron, timber and other materials as may be required by the contractors, and be intended for the construction of the said ship, and which may be brought upon the premises of the contractors, shall immediately thereupon become and be the exclusive property of the Russian Ministry of Marine. The flag of the Imperial Russian Government shall be hoisted on the said ship, whenever desired by the board of inspection, as evidence that the same is said government's exclusive property, and the Russian Ministry of Marine may at any time appoint an officer or officers to take actual possession of the said ship or material, whether finished or unfinished, subject to the lien of the contractors for any portion of the value that may be unpaid."

"ART. 12. The contractors shall insure and keep insured, against all risks usually insured against, the said vessel, its engines and all fittings and materials, at their own cost, but in the name of, and for the benefit of, the Russian Ministry of Marine, in fire insurance companies previously approved by the board of inspection, and in such an amount or amounts as shall be, from time to time, sufficient to cover and recoup to the Imperial Russian Government the sum or sums which said government, for the time being, may have paid, or become bound to pay, to the contractors in respect of such vessel." "Notwithstanding anything herein contained, the ship, together with its engines, machinery and equipment, shall, as between the contractors and the Russian Ministry of Marine, stand, and at all times be, at the risk of the contractors, until the said ship has been accepted by the Imperial Russian Government, or it has taken actual possession thereof."

"ART. 13. The contractors engage, at their own cost and risk, to launch and deliver the vessel safe and uninjured at Philadelphia, Pennsylvania, and equipped for sea, into the charge of the persons appointed by the Imperial Russian Gov-

ernment to receive it, in not more than twenty months after the arrival of the board of inspectors at Philadelphia."

By article 18, the Russian Ministry of Marine agreed to pay the price in ten equal instalments, withholding ten per cent of each instalment until final payment. The instalments were payable at successive periods, the last two being as follows: " 9. Ten per cent when steam has been raised in the boilers and the engines turned over under their own steam. 10. Ten per cent when the ship has had a successful trial trip and has been turned over to the Imperial Russian Government, and simultaneously therewith there shall be paid to the contractors the ten per cent of each of the previous instalments which shall have been withheld as aforesaid."

Alexandroff entered the Russian Navy in 1896, at the age of seventeen, for the term of six years, and was an assistant physician. He was one of fifty-three members of the Russian Navy, sent out in a passenger steamship (not a Russian) by the Russian Government, under command of an officer, for the purpose of becoming part of the crew of the cruiser Variag; and arrived in this country October 14, 1899. The ship was then on the stocks, and was launched in October or November, 1899, and made one trial trip. But in June, 1900, she was still in the custody of the contractors, had not been completed by them, or accepted by the Russian government, and a good many of the contractors' men were still working on her; and only about eighty per cent of her price had been paid. Alexandroff was never on the ship, never signed any paper as a member of her crew, and was never ordered on board of her, either as a seaman or as an assistant physician; but from October, 1899, to April, 1900, lived on shore, with the rest of the men who came with him, had his photograph taken with them, received equipment, support and wages from the Russian Government, and performed the duties required of him as an assistant physician. He left his associates, without leave, at Philadelphia on April 20, 1900, went to New York, and there took up his residence, and on May 24, 1900, made in court a primary declaration of his intention to become a citizen of the United States.

There was introduced in evidence, without objection, a copy

of a letter, (the original of which was said to be in the possession of the Russian Ambassador at Washington,) dated "Treasury Department, Office of the Secretary, Washington, D. C., October 4, 1899," signed by the Acting Secretary of the Treasury, and in these terms :

"Sir : Acknowledging the receipt of your letter of 24th ultimo, No. 557, I have the honor to inform you that, in compliance with request contained therein, instructions have been issued to the commissioner of immigration at the port of New York, to admit without examination the detail of one officer and fifty-three regular sailors whom you state have been detailed to this country for the purpose of partially manning the cruiser now under construction for the Russian Government at Cramp's ship yard in Philadelphia, Pennsylvania. The collector of customs has also been advised that the usual head tax of $1.00 is not to be collected in this case."

This letter was assumed by the courts below to have been addressed to the Russian Ambassador and in answer to a letter from him. But it appears by copies of documents in the Treasury Department, submitted by counsel for the petitioner by leave of this court, that it was in answer to a letter, dated September 24, 1899, No. 557, from the Naval Attaché of the Imperial Russian Embassy at Washington to the Secretary of the Treasury, requesting that the necessary orders to whom it concerned might be given for "allowing admittance to the United States through the port of New York without examination the detail of one officer and fifty-three regular sailors, Imperial Russian Navy, detailed to this country for the purpose of partially manning the cruiser now under construction for the Russian Government at Cramp's ship yard, in Philadelphia, Pennsylvania."

That correspondence also included similar letters between the Naval Attaché of the Russian Embassy and the Secretary of the Treasury of June 22 and 23, 1899, concerning "a detail of one officer and twenty-nine regular sailors for the purpose of partially manning the crusier" aforesaid.

Together with that correspondence, the petitioner submitted to this court copies of papers from the Department of State showing the following :

GRAY, J., FULLER, C. J., HARLAN and WHITE, JJ., dissenting.

On December 6, 1900, the Russian Ambassador wrote to the Secretary of State, saying that the Russian Minister of the Navy had just informed him that 224 sailors of the Russian Imperial Navy, accompanied by three officers, one doctor and a commissary, had embarked at London on the Rhineland for Philadelphia, and that "211 of them have been sent to complete the crew of the Russian cruiser Variag, and the other 13 are under orders for the Retvisan, which is being built by the Cramps of Philadelphia," and requesting the Secretary of State "to notify the Treasury Department of the approaching arrival of these sailors, and to request that they may be allowed to land, and that restitution may be made to the superior officer of the tax imposed on emigrants and paid at the time of their embarkation." On December 15, 1900, the Secretary of State answered that the request had been referred to the Secretary of the Treasury, who had replied that the commissioner of immigration at Philadelphia had been directed to facilitate the landing of the seamen and officers referred to, and the collector of customs to refrain from collecting the *per capita* tax from the steamship company; and that said company should be called upon to refund the amount paid to their Liverpool representative in advance for the head tax. On December 25 and 28, 1900, a like correspondence took place between the Russian Ambassador and the Secretary of State concerning "213 seamen of the Imperial fleet, accompanied by two officers, a monk and a cook," embarked at Liverpool for Philadelphia on the Belgenland, and "sent hither to complete the crew of the Imperial cruiser Variag."

In the Circuit Court of Appeals, on October 1, 1900, the Attorney of the United States for the Eastern District of Pennsylvania, "at the instance of the Executive Department of the Government of the United States," filed by leave of court a suggestion, stating the facts as appearing by the record, and praying that Alexandroff be remanded to the custody of the keeper of the county prison at Philadelphia, to await the order of Captain Vladimir Behr, master of the cruiser Variag.

Such being the facts of the case, we proceed to state the principles by which it appears to us to be governed.

The jurisdiction of every nation within its own territory is absolute and exclusive; by its own consent only can any exception to that jurisdiction exist in favor of a foreign nation; and any authority in its own courts to give effect to such an exception by affirmative action must rest upon express treaty or statute.

In the case of *The Exchange*, decided by this court in 1812, nearly ninety years ago, the point adjudged was that "*The Exchange*, being a public armed ship, in the service of a foreign sovereign, with whom the government of the United States is at peace, and having entered an American port open for her reception, on the terms on which ships of war are generally permitted to enter the ports of a friendly power, must be considered as having come into the American territory under an implied promise that while necessarily within it, and demeaning herself in a friendly manner, she should be exempt from the jurisdiction of the country." 7 Cranch, 116, 147. Chief Justice Marshall, in expounding at large the principles upon which the exemption was founded, began by saying: "The jurisdiction of courts is a branch of that which is possessed by the nation as an independent sovereign power. The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction. All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source. This consent may be either express or implied. In the latter case, it is less determinate, exposed more to the uncertainties of construction; but, if understood, not less obligatory." 7 Cranch, 136. He then dealt with the principal exceptions: 1st. The exemption from arrest or detention of a foreign sovereign entering the territory of a nation with the license of its sovereign. 2d. The immunity which all civilized nations allow to foreign ministers. 3d. The cession of a portion of the ter-

ritorial jurisdiction by allowing the troops of a foreign prince to pass through the territory.

The opinion of Chief Justice Marshall in the case of *The Exchange* has ever since been recognized as laying down the principles which govern the subject. His very language has been embodied by Wheaton in his Elements of International Law, pt. 2, c. 2 ; (8th ed.) §§ 96–101. Phillimore, in his Commentaries on International Law, (3d ed.) 476, 479, says : " Long usage and universal custom entitle every such ship to be considered as a part of the State to which she belongs, and to be exempt from any other jurisdiction." " The privilege is extended, by the reason of the thing, to boats, tenders and all appurtenances of a ship of war, but it does not cover offences against the territorial law committed upon shore." And in 1880, Lord Justice Brett, (since Lord Esher, M. R.,) delivering the judgment of the English Court of Appeal, dealing with " the reason of the exemption of ships of war and some other ships," said, " The first case to be considered is, and always will be, *The Exchange.*" *The Parlement Belge,* 5 Prob. Div. 197, 208.

In the *Santissima Trinidad,* Mr. Justice Story, speaking for this court, said : " In the case of *The Exchange,* 7 Cranch, 116, the grounds of the exemption of public ships were fully discussed and expounded. It was there shown that it was not founded upon any notion that a foreign sovereign had an absolute right, in virtue of his sovereignty, to an exemption of his property from the local jurisdiction of another sovereign, when it came within his territory ; for that would be to give him sovereign power beyond the limits of his own empire. But it stands upon principles of public comity and convenience, and arises from the presumed consent or license of nations that foreign public ships coming into their ports, and demeaning themselves according to law, and in a friendly manner, shall be exempt from the local jurisdiction." " It may therefore be justly laid down as a general proposition, that all persons and property within the territorial jurisdiction of a sovereign are amenable to the jurisdiction of himself or his courts ; and that the exceptions to this rule are such only as by common usage and public policy have been allowed, in order to preserve the peace

and harmony of nations, and to regulate their intercourse in a manner best suited to their dignity and rights." ·7 Wheat. 283, 352–354.

We find no precedent, either in our own decisions, or in the books of international law, for extending the exemption to an uncompleted ship, or to sailors who have never been on board of her, although intended to become part of her crew when she shall have been completed.

On the contrary, Mr. Hall says that where a ship is bought, or is built and fitted out to order, she is only private property until she is commissioned; and, although invested with minor privileges, such as immunity from liens of mechanics, she is far, if she be a ship of war, from enjoying the full advantages of a public character. And again: "The immunities of a vessel of war belong to her as a complete instrument, made up of vessel and crew, and intended to be used by the State for specific purposes; the elements of which she is composed are not capable of separate use for those purposes; they consequently are not exempted from the local jurisdiction. If a ship of war is abandoned by her crew, she is merely property; if members of her crew go outside the ship or her tenders or boats, they are liable in every respect to the territorial jurisdiction." Hall's International Law, (4th ed.) 169, 205. , So Mr. T. J. Lawrence says: "The immunities of which we have been speaking do not follow the members of the ship's company when they land. In their ship and in its boats, which are appurtenant to it and share its privileges, they are exempt from the local jurisdiction; but the moment they set foot on shore they come under the authority of the State, and may be arrested and tried like other foreigners if they commit crimes or create disturbances." Principles of International Law, (3d ed.) 229.

In *The Exchange*, as has always been recognized by this court, it was treated as well settled that a foreign army permitted to march through a friendly country, or to be stationed in it, by permission of its government, is exempt from the civil and criminal jurisdiction of the place. *Coleman* v. *Tennessee*, 97 U. S. 509, 515; *Dow* v. *Johnson*, 100 U. S. 158, 165. "The grant of a free passage," said Chief Justice Marshall, "implies

a waiver of all jurisdiction over the troops during their passage, and permits the foreign general to use that discipline, and to inflict those punishments, which the government of his army may require." 7 Cranch, 140. That rule, waiving the juris-diction of the United States over a body of men, and allowing them to be governed, disciplined and punished by their own officers, applies only to an armed force, segregated from the general population of the country, and lawfully passing through or stopping in the country for some definite purpose connected with military operations.

This is no such case. This was a squad of men intended, in-deed, at some time in the future, to become part of the crew of a ship of war. But they were not yet part of that crew, and were, for six months before the desertion, quartered on shore in the midst of a large city, and were as yet engaged in performing no military or naval duty, beyond the fact that Alexandroff attended the others when sick. The suggestion of the majority of the court that Alexandroff and his associates were sent out by the Russian Government "to take possession of the Variag" must be founded on the statement (which is all that the record contains on the subject) that they were sent out "for the purpose of becoming part of her crew."

The permission to a foreign nation to pass troops or muni-tions of war through the United States has been granted by the Executive Department in a few instances, generally by the Secretary of State. 1 Wharton's International Law Digest, § 13. And there are cases collected by Mr. Cushing, in 7 Opin-ions of Attorneys General, 453, in which the President of the United States has for various purposes acted through the De-partment of the Treasury or some other department within its appropriate jurisdiction. It is not necessary in this case to con-sider the full extent of the power of the President in such matters.

The request of the representative of Russia on September 24, 1899, was simply for the admission into the United States of "one officer and fifty-three regular sailors Imperial Russian Navy, detailed to this country for the purpose of partially manning the cruiser now under construction for the Russian

Government at Cramp's shipyard in Philadelphia, Pennsylvania." And the response of the Secretary of the Treasury, following the terms of the request, stated that instructions had been given to admit them without examination, and not to collect the head tax of one dollar. The other correspondence submitted to this court, and relied on by the petitioner, shows that in June, 1899, the Secretary of the Treasury had given like instructions as to one officer and twenty-nine other sailors; and that, at the request of the Russian Ambassador, in December, 1900, (fourteen months after the arrival of Alexandroff and his associates in this country, and eight months after his desertion,) the Secretary of State and the Secretary of the Treasury gave precisely similar instructions as to a body of two hundred and eleven seamen, and as to another body of two hundred and thirteen seamen, each sent out to complete the crew of the Variag. It thus appears that Alexandroff and his associates, with the previous detail of thirty persons, together constituted less than one sixth of the intended crew of the Variag.

Moreover, all the letters of the Secretary of the Treasury, and of the Secretary of State, show nothing more than an admission into the United States without examination, and an exemption from the head tax, of persons intended to become part of the crew of the cruiser Variag. These persons, coming into the United States for a temporary purpose only, were clearly not immigrants, nor liable to the head tax upon immigrants. A like admission and exemption would apply to any civilians employed by the Russian Government and coming here temporarily in its service.

It is impossible, therefore, to imply such a waiver of the jurisdiction of the United States over them, as in the case of a foreign army marching through or stationed in the United States by consent of the Government. And even permission to march a foreign armed force through the country does not imply a duty to arrest deserters from that force.

The question in this case is not one of the mere exemption of Alexandroff from the jurisdiction of the government and the courts of the United States. The question is whether the

GRAY, J., FULLER, C. J., HARLAN and WHITE, JJ., dissenting.

courts and magistrates of the United States are authorized to exercise affirmative jurisdiction to enforce the control of the Russian authorities over him, after he has escaped from their custody, and to restore him to their control, so that he may be returned to Russia and be there subjected to such punishment as the laws of that country impose upon deserters.

Nations do not generally, at the present day, agree to deliver up to each other deserters from a military force. But it is usual, in order to prevent the ships of war or the merchant vessels of one country from being rendered unfit for navigation by the desertion of their seamen in the ports of another country, to provide by treaty or convention that the authorities of the latter country, upon the application of a consul of the former, should afford assistance in the arrest and detention, and the return to their ships, of seamen deserting from a vessel of either class. 1 Ortolan, Diplomatie de la Mer, (4th ed.) 312, 313; 2 Calvo, Droit International, (5th ed.) §§ 1072, 1073; 1 Phillimore on International Law, (3d ed.) 547, 685; Wheaton on International Law, (8th ed.) 178 note; 1 Moore on Extradition, c. 19.

The United States have made from time to time such treaties with many nations, (a list of which is in the margin,[1]) contain-

---

[1] AUSTRIA. May 8, 1848; 9 Stat. 946. July 11, 1870; 17 Stat. 828.

BELGIUM. November 10, 1845; 8 Stat. 612. December 5, 1868; 16 Stat. 761. March 9, 1880; 21 Stat. 781.

BOLIVIA. May 13, 1858; 12 Stat. 1020.

BRAZIL. December 12, 1828; 8 Stat. 397.

CENTRAL AMERICA. December 5, 1825; 8 Stat. 336.

CHILE. May 16, 1832; 8 Stat. 440.

COLOMBIA. October 3, 1824; 8 Stat. 318.

CONGO. January 24, 1891; 27 Stat. 930.

DENMARK. July 11, 1861; 13 Stat. 606.

DOMINICAN REPUBLIC. February 8, 1867; 15 Stat. 488.

ECUADOR. June 13, 1839; 8 Stat. 548.

FRANCE. November 14, 1788; 8 Stat. 112. June 24, 1822; 8 Stat. 280. February 23, 1853; 10 Stat. 997.

GERMAN EMPIRE. December 11, 1871; 17 Stat. 929.

GREAT BRITAIN. June 3, 1892; 27 Stat. 961.

GREECE. December 22, 1837; 8 Stat. 504.

GUATEMALA. March 3, 1849; 10 Stat. 887.

ing provisions in almost every instance substantially like that of the treaty with Russia of 1832, except that some of them apply only to merchant vessels.

By the Consular Convention with France of November 14, 1788, before the adoption of the Constitution, consuls and vice-consuls were authorized to cause the arrest of "the captains, officers, mariners, sailors and all other persons, being part of the crews of the vessels of their respective nations, who shall have deserted from the said vessels, in order to send them back and transport them out of the country." 8 Stat. 112. That convention was abrogated by the act of July 7, 1798, c. 67. 1 Stat. 578. But a similar provision was made by the Convention with France of June 24, 1822. 8 Stat. 280. And that

HANOVER. May 20, 1840; 8 Stat. 556.

HANSEATIC REPUBLICS. June 4, 1828; 8 Stat. 386.

HAWAIIAN ISLANDS. December 20, 1849; 9 Stat. 980.

HAYTI. November 3, 1864; 13 Stat. 727.

ITALY. February 8, 1868; 15 Stat. 610. May 8, 1878; 20 Stat. 730.

JAPAN. November 22, 1894; 29 Stat. 852.

MADAGASCAR. February 14, 1867; 15 Stat. 493.

MECKLENBURG–SCHWERIN. December 9, 1847; 9 Stat. 917.

MEXICO. April 5, 1831; 8 Stat. 424.

NETHERLANDS. May 23, 1878; 21 Stat. 668.

NEW GRANADA. December 12, 1846; 9 Stat. 896. May 4, 1850; 10 Stat. 904.

OLDENBURG. March 10, 1847; 9 Stat. 868.

PERU–BOLIVIA. November 30, 1836; 8 Stat. 494.

PERU. July 26, 1851; 10 Stat. 944. September 6, 1870; 18 Stat. 714. August 31, 1887; 25 Stat. 1460.

PORTUGAL. August 26, 1840; 8 Stat. 566.

PRUSSIA. May 1, 1828; 8 Stat. 382.

ROUMANIA. June 17, 1881; 23 Stat. 714.

RUSSIA. December 18, 1832; 8 Stat. 448.

SALVADOR. December 6, 1870; 18 Stat. 744.

SAN SALVADOR. January 2, 1850; 10 Stat. 897.

SARDINIA. November 26, 1838; 8 Stat. 518.

SPAIN. February 22, 1819; 8 Stat. 262.

SWEDEN AND NORWAY. July 4, 1827; 8 Stat. 352.

TONGA. October 2, 1886; 25 Stat. 1442.

TWO SICILIES. December 1, 1845; 9 Stat. 838. October 1, 1855; 11 Stat. 651.

VENEZUELA. August 27, 1860; 12 Stat. 1158.

provision was carried into effect by the act of May 4, 1826, c. 36.    4 Stat. 160.

The first general statute on the subject was the act of March 2, 1829, c. 41, (4 Stat. 359,) which, as amended by the act of February 24, 1855, (10 Stat. 614,) by allowing United States commissioners to act in the matter, is embodied in section 5280 of the Revised Statutes, under which the application in this case was made, and which applies only to "any foreign government having a treaty with the United States stipulating for the restoration of seamen deserting."

The Variag, at the time of Alexandroff's desertion, was indeed, in one sense, a ship, because she had been launched and was waterborne. And, by the terms of the contract under which she was being built, the legal title in her, as fast as constructed, had vested in the Russian Government, so that, without regard to the question whether she was a ship of war, she could not have been subjected to private suit *in rem* in admiralty. *The Parlement Belge*, 5 Prob. Div. 197. But she had not been completed, and was in the custody of the contractors, and their men were still at work upon her; by the express terms of the contract, she might still be rejected by the Russian Government, and remained at the risk of the contractors until that government had accepted her or taken actual possession of her; and she had not been fully paid for. She was not equipped for sea, and never had any part of her crew on board, and she had never been accepted, or taken actual possession of, by the Russian Government. Alexandroff and his associates were a squad of men, sent out six months before by the Russian Government for the purpose of becoming part of her crew, and received wages as members of the Russian Navy. But they had never become part of an organized crew, or done any naval or military duty, or been on board of her, or been ordered on board of her; for the whole six months they had lived together on shore; and no regular ship's roll, or other official document, was produced showing that they had actually become part of the crew of the Variag.

The treaty with Russia of 1832 speaks of "deserters from the ships of war and merchant vessels of their country;" and

section 5280 of the Revised Statutes speaks of persons who have "deserted from a vessel of any such government;" each applying only to those who desert from a ship. Both the treaty and the statute require proof to be made by exhibition of the register of the vessel, ship's roll or other official document, that the deserter, at the time of his desertion, belonged to, or formed part of, her crew. And the provision of the treaty for the detention of the deserters until "they shall be restored to the vessels to which they belonged, or sent back to their own country by a vessel of the same nation or any other vessel whatsoever," necessarily implies that they belong to a completed vessel upon which they could remain from day to day, and the departure of which may require them to be sent back by another vessel. The object of both treaty and statute, as of the treaties with other nations upon the same subject, was not to encourage shipbuilding for foreign nations in the ports of the United States, or to cover unfinished ships and preparations for manning them when finished; but it was to secure the continued capacity for navigation of ships already completely built, equipped and manned. Both treaty and statute look to a complete ship, and to an organized crew; and neither can reasonably be applied to a ship which has never been completed, or made ready to receive a crew, or had any roll or list of them, or to men who have never been on board the ship as part of her crew. Moreover, the Russian Government, as is admitted, had never accepted or taken possession of the ship, and, by the terms of the contract under which she was building, still had the right to reject her. So long as they had that right, no body of men could be considered as actually part of her crew, whatever they might have been after her acceptance. The evident intent of the statute, as of the treaty, is to afford a remedy for the common case of sailors deserting their ship, on her coming into port, at the risk of leaving her with no sufficient crew to continue her voyage; and not to the case of a ship which has never been completed, or equipped for sea, or to persons collected together on shore for an indefinite period, doing no naval duty, though intended ultimately to become part of her crew.

The various treaties of the United States with foreign nations

GRAY, J., FULLER, C. J., HARLAN and WHITE, JJ., dissenting.

apply in a few instances, as in the treaties with Spain of 1819, and with Great Britain of 1892, to merchant vessels only, but, for the most part, as in the treaty with Russia, to both ships of war and merchant vessels. When they apply to both, (except in the treaties with Peru,) deserters from ships of war are put upon the same footing with deserters from merchant vessels; and no greater authority is given to arrest and surrender in the case of the one than in that of the other. Could it be contended that the authority should be extended to the case of sailors who had been collected together on shore for the purpose of becoming, in the future, part of the crew of a merchantman still in the course of construction, and not yet ready to receive them?

The statutes regulating the contract between the owner of a merchantman and his sailors do not appear to us to have any bearing upon the construction and effect of this treaty. Those statutes relate to seamen who, by their shipping articles, have agreed to render themselves on board at a certain time, and to their right to compensation and liability to punishment, or to forfeiture of wages, after that time. Rev. Stat. §§ 4522, 4524, 4527, 4528, 4558; Act of December 21, 1898, c. 28, §§ 2, 9; 30 Stat. 755, 757. And section 4599 of the Revised Statutes (repealed by section 25 of the act of 1898) provided for the arrest and detention, by police officers, of any seaman, having signed such articles, who "neglects or refuses to join, or deserts from or refuses to proceed to sea in" his vessel. The clause "neglects or refuses to join" would have been superfluous if legally included in the word "deserts." The treaty contains no such clause.

The treaty, as already stated, requires the fact that the deserter was part of the crew of the vessel to be proved by the exhibition of the register of the vessel, the roll of the crew, or other official document. Attorney General Black was of opinion that an exhibition of the original ship's roll, or a corresponding document containing the names of the whole crew, was essential, and could not be supplied by a copy of an extract from the roll, containing the deserter's name; and said: "It might be convenient, in cases like this, to dispense with the production of the original document, and let the rights of the person claimed

as a deserter depend on the mere certificate of a consul; but a written compact between two nations is not to be set aside for a shade or two of convenience more or less." 9 Opinions of Attorneys General, 96. However that may be, in this case there is no pretence that the Variag had, or was in a condition to have, any roll or list of her crew ; and at the hearing it was not admitted that there was any such roll or list, or that Alexandroff was a member of her crew, but only that he was a member of the Russian Navy, sent out for the purpose of becoming part of her crew. The treaty cannot be construed as extending to the case of a ship which has never been completed, or ready to receive her crew, or had any roll or list of the crew ; or to a small part of the men, ultimately intended to form part of her crew, who have never been such, nor ever been on board, but have remained for six months on shore, doing no naval duty.

Moreover, it being quite clear, and indeed hardly denied, that the Variag, in her existing condition, was not a Russian ship of war exempt from the jurisdiction of the United States and subject to the exclusive jurisdiction of her own country, it would seem necessarily to follow that she was not a ship of war in the sense that the authorities of the United States could take affirmative action to enforce the jurisdiction of that country over her or over the men intended to become part of her crew.

The necessary conclusion is that neither the treaty with Russia of 1832, nor section 5280 of the Revised Statutes, gave any authority to the United States commissioner to issue the warrant of commitment of Alexandroff.

It was argued, however, at the bar, that, if this case did not come within the treaty or the statute, the United States were bound, by the comity of nations, to take active steps for the arrest of Alexandroff, and for his surrender to the Russian authorities. But this position cannot be maintained.

The treaties of the United States with Russia and with most of the nations of the world must be considered as defining and limiting the authority of the government of the United States to take active steps for the arrest and surrender of deserting seamen.

These treaties must be construed so as to carry out, in the

utmost good faith, the stipulations therein made with foreign nations. But neither the executive nor the judiciary of the United States has authority to take affirmative action, beyond the fair scope of the provisions of the treaty, to subject persons within the territory of the United States to the jurisdiction of another nation.

The practice of the Executive Department, from the beginning, shows that such authority does not exist, in the absence of express treaty or statute. The precedents on the subject are collected in 1 Moore on Extradition, §§ 408–411, and we have examined the archives of the Department of State, to which upon such a subject we are at liberty to refer. *Jones* v. *United States*, 137 U. S. 202, 216 ; *Underhill* v. *Hernandez*, 168 U. S. 250, 253 ; *The Paquete Habana*, 175 U. S. 677, 696.

In 1802, in the administration of President Jefferson, the British Chargé d'Affaires complained to Mr. Madison, Secretary of State, of the refusal of the collector of customs at Norfolk in Virginia to cause a seaman, who had deserted from a British ship of war, to be surrendered, on an application made by her captain, through the British consul at that port. Mr. Madison answered : " It need not be observed to you, Sir, that a delivery in such cases is not required by the law of nations, and that in the treaty of 1794 the parties have forborne to extend to such cases the stipulated right to demand their respective citizens and subjects. It follows that the effect of applications in such cases must depend on the local laws existing on each side. It is not known that those in Great Britain contain any provisions for the delivery of seamen deserting from American ships. It is rather presumed that the law would there immediately interpose its defence against a compulsive recovery of deserters. In some of the individual States the law is probably similar to that of Great Britain. In others it is understood that the recovery of seamen deserting from foreign vessels can be effected by legal process." And, after stating that there was no law for their recovery in Virginia, he concluded : " This view of the subject necessarily determines that the President cannot interpose the orders which are wished, however sensible he may be of the beneficial influence which friendly and reciprocal resto-

rations of seamen could not fail to have on the commerce and confidence which he wishes to see cherished between the two nations." 14 MSS. Domestic Letters, 89, in Department of State.

In 1815, in the administration of President Madison, the British Minister having requested the interposition of the Government of the United States to cause the delivery of seamen who had deserted from a British ship of war, Mr. Monroe, Secretary of State, answered: " I regret that there is no mode in which this government can interpose to accomplish the object you have in view. Neither the laws of the United States nor the laws of nations have provided for the arrest or detention of deserters from the vessels of a friendly power. It is hoped, however, that this is one of the subjects which may hereafter be satisfactorily arranged by treaty between the two nations." 1 Moore, § 408.

In 1846, in President Polk's administration, the British Minister applied for the surrender of a seaman who had deserted from a British ship of war, and was serving on a war vessel of the United States; and Mr. Buchanan, Secretary of State, replied: " Your communication has been submitted to the President; and I am instructed to express his regret that he cannot comply with your request. The case of deserters from the vessels of war of the respective nations is not embraced by the tenth article of the treaty of Washington providing for extradition in certain cases; and without a treaty stipulation to this effect, the President does not possess the power to deliver up such deserters. The United States have treaties with several nations which confer upon him this power; but none such exists with Great Britain." 7 MSS. Notes to Great Britain, 147, in Department of State.

In September, 1864, in the administration of President Lincoln, while the United States steamship Iroquois was lying in the Downs, three of her seamen deserted. They were arrested on complaint of the United States consular agent, brought before a police magistrate at Dover, and discharged by him, on the ground that, as they had violated no law of England, there was no authority for their arrest and detention. Upon the mat-

GRAY, J., FULLER, C. J., HARLAN and WHITE, JJ., dissenting.

ter being brought by Mr. Adams, the American Minister, to the attention of the British Government, Lord Russell replied " that there is no law in force in this country by which these deserters could be given up." 1 Moore, § 409; Dip. Cor. 1864, pt. 2, 336.

In July, 1864, Lord Lyons, the British Minister, submitted to Mr. Seward, Secretary of State, a statement that two apprentices, employed on board the British barque Cuzco, had deserted at Valparaiso and enlisted on a United States ship of war ; and asked for an investigation. On December 4, 1864, Mr. Seward communicated the results of the investigation to the British Chargé d'Affaires ; and informed him that, owing to the action of the British Government in the case of the deserters from the Iroquois, the United States did not deem themselves under either a legal or a moral obligation to deliver up the deserters from the Cuzco. On February 23, 1865, the British Chargé d'Affaires, by instructions from his government, replied that it was unable to follow the principle or reason of the resolution of the United States Government, and insisted that " it is in the power of the naval officers of the United States (as it would be in that of Her Majesty's naval officers in a like case) to deliver up on the high seas, or in any foreign port, under the instructions of their government, deserters from foreign vessels who may without lawful authority be found on board one of the ships of war of the United States ; " but he distinctly admitted and asserted : " But when a foreign deserter is on shore in Great Britain, (and Her Majesty's government presume the case would be the same in the United States,) the power of Her Majesty's naval officers and of Her Majesty's government itself over him is at an end ; he can then only be detained or delivered up for some cause authorized by the law of the land." The case was not further pursued. 1 Moore, § 409, and note.

The earliest treaty between the United States and Great Britain on the subject is that of June 2, 1892, which applies only to merchant seamen, being limited to " seamen who may desert from any ship belonging to a citizen or subject of their respective countries." 27 Stat. 961.

The first treaty with Denmark on the subject is that of July 11, 1861, concerning " deserters from the ships of war and merchant

vessels of their country." 13 Stat. 606. In 1853, in the administration of President Pierce, on a question of the arrest of a deserter from a Danish ship and his discharge by the authorities in New York, (the treaties between the United States and Denmark not then containing any stipulation for the restoration of deserting seamen,) Mr. Cushing, as Attorney General, gave an opinion to Mr. Marcy, Secretary of State, that without such a treaty the executive or judicial authorities of the United States had no power to arrest, detain and deliver up a Danish mariner on the demand of the consul or other agents of Denmark, and said : "The summary arrest and delivery up of deserters from the service of other nations, like the surrender of fugitives from their criminal justice, when found in the territory of a country into which they have escaped or fled, is not a duty absolutely enjoined by the law of nations, but a subject of special convention. So also are the authority and jurisdiction of consuls and commercial agents in regard to demanding and superintending the arrest, detention and surrender, either of deserters from service or fugitives from justice." 6 Opinions of Attorneys General, 148, 154.

This uninterrupted course of action of the Executive Department, beginning almost a century ago, must be considered as conclusively establishing that, independently of a treaty, no international obligation exists to surrender foreign seamen who have deserted in this country.

It is hardly necessary to add that the suggestion of the District Attorney can have no effect, other than to call the attention of the court to the facts of the record. The question whether those facts justified the commitment of the prisoner by the United States commissioner is a question to be decided, not by the Executive Department or by any of its officers, but by the courts of justice.

According to our view of the facts, and for the reasons and upon the authorities above stated, we are of opinion that the commissioner had no authority to commit the prisoner, that his imprisonment was unlawful, and that he is entitled to be discharged.